Morris Fierson, of New York City, with whom Jack Kranis, of New York City, was on the brief, for complainants.

**FEDERATED MEAT CORPORATION et al. v. FLEMING, Temporary Controls Administrator.**

**No. 330.**

United States Emergency Court of Appeals. Heard at New York Dec. 6, 1946.

Decided Feb. 12, 1947.

Irving J. Helman, Attorney, of Washington, D. C., with whom Richard H. Field, General Counsel, Carl A. Auerbach, Associate General Counsel, and William R. Ming, Jr., Chief, Court Review Price Branch, all of the Office of Price Administration, all of Washington, D. C., were on the brief, for respondent.

Before MARIS, Chief Judge, and MaGRUDER and McALLISTER, Judges.

MAGRUDER, Judge.

This is the first case we have had involving the validity of Maximum Price Regulation No. 574—Live Bovine Animals (Cattle and Calves), issued January 29, 1945 (10 F.R. 1270). In several previous cases the related regulation, Revised Maximum Price Regulation No. 169—Beef and Veal Carcasses and Wholesale Cuts (7 F.R. 10381) has been under fire. Armour & Co. v. Bowles, Em.App., 1945, 148 F.2d 529, certiorari denied, 1945, 325 U.S. 871, 65 S.Ct. 1411, 89 L.Ed. 1989; Oswald & Hess Co. v. Bowles, Em.App., 1945, 148 F.2d 543, certiorari denied, 1945, 325 U.S. 871, 65 S.Ct. 1411, 89 L.Ed. 1990; Heinz v. Bowles, Em.App., 1945, 149 F.2d 277, and upon reconsideration, Em.App., 1945, 150 F.2d 546; The E. Kahn's Sons Co. v. Bowles, Em. App., 1945, 149 F.2d 277, certiorari denied, 1945, 326 U.S. 719, 66 S.Ct. 24; Ben H. Rosenthal & Co., Inc., v. Porter, Em.App., 1946, 158 F.2d 171.

We refer to our opinion in Armour & Co. v. Bowles, Em.App., 148 F.2d 529, at pages 531-533, for a somewhat detailed statement of the evolution of the price control program as applied to meat. The difficulties encountered seem to have been attributable in large part to the fact that it was deemed impracticable to establish ceiling prices on live cattle because of the difficulty of grading cattle on the hoof, and particularly the difficulty of determining the grade of carcass beef which any individual animal will produce. The cattle stabilization plan instituted pursuant to the Directive of the Office of Economic Stabilization issued October 25, 1943 (8 F.R. 14641), sought to impose an indirect control upon live cattle prices by depriving the buyer of his subsidy to the extent that his total monthly payments for all grades of cattle purchased exceeded the price ranges established for the various grades. These price ranges were fixed with a view to bringing into proper relationship the prices for live cattle and the prices for beef carcasses and wholesale cuts established in RMPR 169.

The total maximum permissible payment (without loss of subsidy) for all cattle slaughtered during a monthly accounting period was computed in the following manner: After slaughter, the dressed carcasses were graded.[1] The slaughterer determined the total tonnage of beef carcasses, by grades, obtained from the cattle slaughtered during the monthly accounting period. The equivalent or "calculated" live weight of cattle in each grade slaughtered during the period was computed from the dressed carcass weights by the use of conversion factors or average dressing percentages, each dressing percentage being the ratio of the weight of the dressed carcass of the particular grade to the calculated live weight of the animal. These conversion factors, which were determined and certified to the Defense Supplies Corporation by joint order of the Price Administrator and the War Food Administrator, were as follows for the different grades: Choice, 61%; good, 58%; commercial or medium, 56%; utility or common, 54%; canner and cutter, 46%; and bulls of canner and cutter grade, 53%.[2] That meant, for example, that a steer of "choice" grade was assumed to yield a dressed carcass weight of 61% of the live weight; and so on, through the various lower grades. The calculated live weight did not necessarily coincide with the actual weight of the steer before slaughter, but was arrived at by working backward from the graded dressed carcass, the weight of which was divided by the standard percentage yield factor applicable to the particular grade. The aggregate calculated live weight for cattle of each grade slaughtered during the accounting period was multiplied by the maximum price of the applicable range prices, and the amounts thus derived for each grade were added together. The resulting total figure was the maximum permissible amount which the slaughterer could pay for the cattle slaughtered during the accounting period without loss of subsidy. An illustration taken from the Price Administrator's opinion will serve to make clearer the method of computation.[3] The determinations were made separately for each slaughtering plant where a slaughterer's cattle were slaughtered.

Pursuant to a Directive of the Office of Economic Stabilization, issued January 10,

---

[1] In the Statement of Considerations accompanying the issuance of MPR 574, the Administrator stated: "Accurate determination of the grade of live cattle and calves can only be made after the grading of the beef and veal produced from such cattle and calves. Descriptions of most grades of live cattle and calves have been issued by the United States Department of Agriculture. Although these informal standards are used by that agency in reporting and quoting live cattle and calf prices at the major markets throughout the United States, they have not been promulgated as official standards. In view of the difficulties and imperfections involved in trying to determine the grades of cattle and calves on the hoof, and the greater importance of the dressed grades to the consumer, official grading is confined to the dressed stage."

[2] The appropriateness of these standard percentage yields was questioned in the protests, but no evidence was offered in support of the objection and it has not been carried forward into the complaint.

[3] "Assume two steers of commercial grade each weighing 1,000 pounds. One yields 56 percent of beef, the standard.

1945 (10 F.R. 522), MPR 574 went a step further, and incorporated the cattle stabilization plan into the price regulation itself, thus adding the sanctions of the Price Control Act to the sanction of loss of subsidy in order to induce slaughterers to keep their purchases of live cattle within the prescribed range prices in the over-all monthly average. Section 2 provided that no person in the course of trade or business "shall pay for live cattle bought or received during any accounting period an amount higher than the maximum amount fixed by this regulation for such live cattle during such accounting period". This prohibition was imposed upon buyers of live cattle only, not sellers.

MPR 574 in addition established an overriding ceiling price, without regard to grade, for sale or delivery of any live bovine animal or lot of live bovine animals. Although the overriding ceiling was technically applicable to the sale of any grade of cattle, its practical purpose was to put a price limit on sales of choice cattle while avoiding the difficulty of grading each animal on the hoof. The overriding ceiling was applicable both to seller and buyer.

Federated Meat Corp. and United Meat Co., Inc., are both engaged in the slaughtering business in Brooklyn, New York. They filed their separate protests against MPR 574 on February 20, 1946. The protests were consolidated by the Administrator since they raised identical objections to the regulation, and on March 26, 1946, the Administrator issued his order denying both protests. Protestants having introduced no evidence in the protest proceedings, some of their objections necessarily failed for lack of factual support in the record. Upon denial of their protests, the two companies filed a joint complaint in this court.

Since livestock were removed from price control by Amendment 64 to Supplementary Order 132, issued October 15, 1946 (11 F.R. 12093), this case would now be moot but for the fact, as we are informed, that there are several criminal complaints pending against each of the present complainants in the War Emergency Court of the City of New York, charging them with violations of MPR 574 during the period April 2, 1945, through March 31, 1946. These prosecutions are not founded on the Emergency Price Control Act but upon a provision of the Administrative Code of the City of New York making it unlawful for any person to sell or deliver any commodity, or in the course of trade or business to buy or receive any commodity, at a price in excess of an applicable maximum price regulation issued by the Office of Price Administration of the United States of America. The penalties provid-

factor for that grade, and the other yields 53 percent. The calculation of the maximum permissible payment for each of the two steers would be as follows:

|  | (1) | (2) |
|---|---|---|
| Live weight | 1,000 lbs. | 1,000 lbs. |
| Weight of carcass | 560 lbs. | 530 lbs. |
| Conversion factor | 56 percent | 56 percent |
| Calculated live weight | 1,000 lbs. | 946.4 lbs. |
| Maximum price per cwt. (zone 19) | $13.55 | $13.55 |
| Maximum permissible payment for steer | $135.50 | $128.24 |
| Maximum price per cwt. on actual live weight | $13.55 | $12.82 |

Although the steer yielding only 53 percent of beef actually weighed a thousand pounds, its 'calculated live weight' as computed under the provisions of the Regulation in terms of cattle yielding 56 percent is only 946.4 pounds. The maximum price of $13.55 per 100 pounds on the calculated live weight is equal to only $12.82 on the actual live weight. The slaughterer can pay $13.55 per 100 pounds actual live weight for the steer yielding 56 percent of commercial beef and remain in compliance with the maximum permissible cost but can pay only $12.82 for a similar steer yielding 53 percent and remain in compliance with the maximum permissible cost. It follows, therefore, that the Regulation, in effect, establishes lower prices than the maximum range prices set up in the table of the Regulation for cattle having a lower yield than the standard conversion yield."

While the price paid by the slaughterer for any particular lot of cattle might prove to be higher than the maximum permissible cost as thus computed, this excess might be offset by purchases of other lots during the accounting period. The important thing was the over-all result of the purchases of all grades of cattle during the month.

ed are a fine or jail sentence or both for each such violation. Since, under § 204 (d) of the Price Control Act, 50 U.S.C.A. Appendix, § 924(d), the Emergency Court of Appeals has exclusive jurisdiction to determine the validity of MPR 574, complainants now seek from us, to be used as a defense in the local enforcement proceedings, a judgment declaring that the regulation was void ab initio.

It is objected that MPR 574 is contrary to law in that the statutory authority to impose price controls necessarily implied that such controls must be imposed upon sellers, and not upon buyers only. The premise upon which this objection is based does not accurately reflect the effect of the regulation. The overriding ceiling price was imposed upon buyer and seller alike. Where each sale was viewed separately, any restriction on the price the buyer might pay was likewise a restriction on the price the seller might charge. The obligation imposed upon the buyer only was to keep the total amount paid for all cattle during the accounting period within the maximum permissible cost, computed as above described. We have no doubt that the Administrator was authorized by the Act to impose such an obligation upon the buyer. Section 2(a), 50 U.S.C.A.Appendix, § 902(a), empowers the Administrator to establish "such maximum price or maximum prices as in his judgment will be generally fair and equitable and will effectuate the purposes of this Act." Section 2(c) broadly provides that price regulations "may be established in such form and manner * * * as in the judgment of the Administrator are necessary or proper in order to effectuate the purposes of this Act." That Congress contemplated the imposition of controls upon buyers in the course of trade or business is manifest from § 4(a), 50 U.S.C.A.Appendix, § 904(a). There is nothing in the record to challenge the determination of the Administrator that it was wholly impracticable to go further in imposing direct controls upon sellers of live cattle than was provided in MPR 574. The cattle stabilization plan, as incorporated in the subsidy regulation of the Defense Supplies Corporation, was instituted pursuant to § 2(e) of the Price Control Act (see Illinois Packing Co. v. Bowles, Em.App., 1945, 147 F.2d 554, and its validity is not herein question. Considering the peculiar administrative problems as they became manifest in the evolution of the program for controlling meat prices, we think it was appropriate for the Administrator to reenforce the cattle stabilization plan in the manner provided in MPR 574.

Complainants urge that MPR 574 was arbitrary and capricious in its application to slaughterers in that it was not until after the cattle had been slaughtered and dressed that determination could be had of the price which the slaughterer should have paid at the time and place of purchase; thus "at the only time that the slaughterer can determine as a practical matter that he has overpaid for the beef, he is already liable for a breach of the regulation."

It is true that the buyer, by misjudging the dressing yield or grade which a given lot of live cattle would produce, might unintentionally pay more than he should for the particluar lot. But this in itself would not put the buyer in violation of the regulation. The particular overpayment might be offset by other purchases during the accounting period. Compliance was measured solely by the over-all result of the whole accounting period.

Even before price control, the success of a slaughterer's business required some skill or expertness in buying cattle on the hoof. The buyer had to be pretty good at estimating the probable grade and yield in order to determine the amount he could afford to pay for the cattle consistently with making a profit at the prevailing prices for dressed beef.

Another factor of uncertainty stressed by the complainants is that, when they made a purchase of cattle through an agent in the western market, it was requisite, in order to keep in compliance with MPR 574, to make a fairly correct estimate of the loss of yield due to shrinkage incidental to transportation of the cattle to complainants' slaughtering plants in Brooklyn, New York (zone 19). This again was an estimate the slaughterer had to make as an ordinary incident of his business prior to

price control. In his opinion the Administrator said, on this point:

"Reduction in live weight in transit is not a factor in computing maximum permissible cost. Compliance with the maximum permissible cost provisions is determined on the basis of the calculated live weight which depends on the carcass weight rather than the actual live weight. There is, of course, some flesh shrinkage in shipping live animals, and if the carcass of an animal shipped to an eastern point weighs less than the carcass of such animal slaughtered at the purchasing point, the calculated live weight at the eastern point would be less than the calculated live weight would have been if it had been slaughtered at the point of purchase. Applying the same maximum price to the calculated live weight would mean a lower permissible cost to the eastern slaughterer. Because of this factor of flesh shrinkage and transportation, the maximum range prices applicable to eastern slaughterers are higher than the maximum range prices applicable to midwestern slaughterers who are near the center of cattle production; and the higher maximum range prices in the eastern area, together with the transportation allowance, take into consideration the factors of transportation and flesh shrinkage experienced by eastern slaughterers when purchasing in the Middle West."

In the absence of evidence to the contrary, we must assume that the zone differentials above referred to were adequate to compensate for these factors of transportation costs and anticipated flesh shrinkage.

Pursuant to our leave, the Administrator submitted directly to the court as additional evidence a study indicating that the industry as a whole managed to purchase cattle within the maximum permissible costs as prescribed in the cattle stabilization plan and MPR 574. The study does indicate, however, a considerable amount of individual noncompliance; and indeed, in a few of the price zones, the combined cost for all slaughterers located therein was above the prescribed maximum for certain accounting periods. It may be that a slaughterer who, after the dressed carcasses were weighed and graded, discovered that he had paid more than the permissible maximum cost for a particular lot of cattle, might in some cases have found it difficult or impossible, due to the pressure of live cattle prices, to make an offsetting purchase at less than the maximum during the same accounting period.

But giving full weight to the possibility that a slaughterer, at the end of a given accounting period, might have found himself inadvertently and unintentionally out of compliance with MPR 574, that in itself would not render the regulation invalid. The criminal penalties of § 205(b) of the Price Control Act, 50 U.S. C.A.Appendix, § 925(b), attach only where the regulation was "willfully" violated. The civil penalty of treble damages in § 205(e) of the Act is imposed upon sellers only, not buyers who violate a price regulation. So far as concerns the loss of subsidy, that is governed by the provisions of the subsidy regulation of the Defense Supplies Corporation ·rather than by MPR 574.[4]

We are informed by counsel for complainants that, under the criminal provisions of the Administrative Code of the City of New York, as interpreted, complainants may be convicted in the local War Emergency Court for violation of MPR 574, even though their violations were not willful. If so, a question might arise as to the constitutionality of the Administrative Code as applied to complainants in the circumstances of the particular cases pending before the War Emergency Court. But complainants are free to raise such a constitutional question in the local court. Cf. Yakus v. United States, 1944, 321 U.S. 414, 430, 64 S.Ct. 660, 88 L.Ed. 834.

A judgment will be entered dismissing the complaint.

---

4 The administrative burden of making the necessary factual determinations would probably have rendered it ·impracticable for the subsidy regulation to provide that the subsidy would not be withheld in cases where the slaughterer's noncompliance was not attributable to his own willfulness or lack of due diligence.