MERCHANTS PACKING CO. v. RECONSTRUCTION FINANCE CORPORATION.

No. 487.

United States Emergency Court of Appeals.

Heard at Washington, March 28, 1949.

Decided Sept. 29, 1949.

3. See In the matter of Kuskin and Rotberg, Inc., III Op. & Dec. p. 3217 (O. P. A. 1945).

Warren Woods, Atlanta, Ga., for complainant.

George Arthur Fruit, Attorney, Washington, D. C. (Joseph M. Friedman, Special Assistant to the Attorney General, both of the Department of Justice, on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LINDLEY, Judges.

MAGRUDER, Judge.

This is another case involving claims filed with the Reconstruction Finance Corporation for livestock slaughter subsidy

payments provided for in Revised Regulation No. 3, as amended. For extended discussion of the origin, legal basis, purposes and mechanisms of the meat subsidy program, we refer to our opinions in Armour & Co. v. Bowles, Em.App.1945, 148 F.2d 529, certiorari denied 1945, 325 U.S. 871, 65 S.Ct. 1411, 89 L.Ed. 1989; Illinois Packing Co. v. Bowles, Em.App.1945, 147 F.2d 554; Illinois Packing Co. v. Snyder, Em.App.1945, 151 F.2d 337; Earl C. Gibbs, Inc., v. Defense Supplies Corp., Em.App. 1946, 155 F.2d 525, certiorari denied, 1946, 329 U.S. 737, 67 S.Ct. 51, 91 L.Ed. 637; Federated Meat Corp. v. Fleming, Em.App. 1947, 159 F.2d 725, and William Schluderberg-T. J. Kurdle Co. v. R.F.C., Em.App. 1948, 169 F.2d 419, certiorari denied 1948, 335 U.S. 846, 69 S.Ct. 68.

Cattle slaughter subsidy payments were originally established, effective June 7, 1943, by Regulation No. 3 (8 F.R. 10826), issued by Defense Supplies Corporation, a corporation created under § 5d of the Reconstruction Finance Corporation Act, as amended (6 F.R. 2972), and empowered to act as paying or disbursing agent in respect to the subsidies to livestock slaughterers. A so-called cattle stabilization plan, instituted pursuant to directive of the Office of Economic Stabilization issued October 25, 1943 (8 F.R. 14641), was designed to impose an indirect control upon live cattle prices by subjecting the buyer to a loss of subsidy when his total monthly payments for all grades of cattle purchased exceeded the price ranges established for the various grades. The subsidy regulation as it had been amended from time to time was reissued as Revised Regulation No. 3, effective January 19, 1945 (10 F.R. 4241). Defense Supplies Corporation was dissolved on July 1, 1945, and its functions transferred to respondent RFC by the Act of June 30, 1945, 59 Stat. 310, 15 U.S.C.A. § 611 note. Revised Regulation No. 3, as amended, was then taken over and administered directly by RFC (10 F.R. 11155).

The Office of Economic Stabilization, which had been given overriding authority over the entire subsidy and stabilization program by Executive Order 9250 (7 F.R. 7871—see our discussion in Earl C. Gibbs, Inc., v. Defense Supplies Corp., supra, 155 F.2d 525), issued Amendment 3 (11 F.R. 3102) to its Directive 41 (10 F.R. 4494), by which amendment, effective April 1, 1946, RFC was directed to withhold payment of subsidy claims, in accordance with a prescribed sliding scale of penalty deductions, in cases where a slaughterer's claim, on Form DS-T-55, showed an aggregate cost of cattle, for the monthly accounting period covered by the claim, in excess of the maximum permissible cost under the cattle stabilization plan.[1] Section 7(b)(5) of Directive 41, as added by the aforesaid Amendment 3, provided, however, that a slaughterer might apply to the Price Administrator at Washington, D. C., for a release of the subsidy payments which RFC had thus been directed to withhold. The subsection further provided as follows:

"Upon a finding by the Price Administrator that such overpayment was due to extenuating circumstances and that the release of the subsidy withheld, or a portion thereof, would not be inconsistent with the stabilization program, he may so certify to Reconstruction Finance Corporation, setting forth the amount of the subsidy to be released and thereupon such amount of subsidy shall be payable forthwith."

In conformity with the terms of the above Directive, Revised Regulation No. 3 was amended by Amendment 15 issued March 21, 1946, effective April 1, 1946. By this amendment, the subsidy regulation was revised so as to add to § 7003.6(b) thereof a new paragraph (3) incorporating the sliding scale penalty deductions above referred to; and the amended regulation further provided that such deductions, or any part thereof, should be repaid to the applicant by RFC in accordance with any certifications by the Price Administrator to the effect above stated.

---

1. See Federated Meat Corp. v. Fleming, Em.App.1947, 159 F.2d 725, 726, for a discussion of the method of calculating this maximum permissible cost.

As the subsidy regulation was thus set up, RFC as paying agent was required to make deductions from livestock subsidy payments when the claims disclosed that the applicant had exceeded, for the accounting period in question, the maximum permissible cost for live cattle bought by him; and the amount of the deductions was determined by the sliding scale formula incorporated in the regulation. RFC had no discretion in the matter; the deductions were automatic. In that connection RFC was obliged to accept as conclusive the grading certificates issued by the official graders of the U. S. Department of Agriculture; as paying agent, RFC was given no function or authority to review and revise such grading certificates. Furthermore, RFC was not authorized to release any of the subsidy payments thus withheld, except upon receipt of a certification from the Price Administrator.

The function of the Price Administrator to make such certifications was, by Executive Order 9809 (11 F.R. 14281) issued December 12, 1946, 50 U.S.C.A.Appendix, § 601 note, transferred to the Office of Temporary Controls. Later, by Executive Order 9841 (12 F.R. 2645), issued April 23, 1947, 50 U.S.C.A.Appendix, § 601 note, this function was finally transferred to RFC itself. Thus, there were eventually coalesced in RFC (1) the function of paying agent charged with the automatic duty to withhold certain subsidy payments by way of penalty deductions, and (2) the function, upon application by a slaughterer who had been subjected to such penalty deductions, of finding and certifying the

existence of "extenuating circumstances", etc., and making the discretionary determination as to the amount of the withheld subsidy payments to be released to the applicant. In the interest of clarity these two functions, and their separate derivations, should be kept distinct.

With the foregoing preliminary statement, it is now in order to summarize the facts of this particular case.

Merchants Packing Company, the complainant, in the winter of 1945-46 built a slaughtering plant in Chicago, Illinois, for the purpose of opening a custom slaughtering business. The plant was opened for business on March 14, 1946. It had a slaughtering capacity of 240 carcasses per day. Its projected storage or holding cooler capacity was 240 carcasses—described by complainant's president as "very limited for an operation of this size." On or about April 1, 1946, the Meat Inspection Division of the Department of Agriculture, though it is alleged to have originally approved the plans in the blueprint stage, ordered the slaughterer, for sanitary reasons, to discontinue the use of the south rail in the storage cooler and to curtail the use of the north rail approximately 50 per cent.[2] This resulted in a reduction of the capacity of the holding cooler from 240 to 140 carcasses.

Due to restrictions on the custom slaughtering business imposed by Amendment 69 to Revised Maximum Price Regulation No. 169 (11 F.R. 3299), effective April 1, 1946, complainant had to abandon its custom slaughtering operations. Thereafter it continued operations as a straight slaugh-

2. An official of the Department of Agriculture describes the reasons for this curtailment order as follows:

"No provision had been made by Mr. Nothy for a truck runway from the offal cooler to the elevator or the door leading to the shipping dock. With the inadequate space available, it was necessary to provide additional space for hand trucks to pass through the beef storage cooler, and this could only be accomplished by withdrawing the privilege of using this beef storage rail, until such time as he would provide a suitable means of remov-

ing the offal product from the offal cooler to the shipping dock or elevator, without coming in contact with the beef sides hanging on this rail.

"The use of the rail parallel to the north wall had been curtailed to approximately 50% due to the damage of the plaster on the wall by swinging sides of beef. In pushing the beef along the rail, they would have become contaminated with plaster if the Establishment had been allowed to use this rail to full capacity."

tering business on its own account, concentrating on the top grades of beef demanded in the hotel and restaurant supply field.

Complainant filed with the RFC its claims for livestock subsidy payments for the months of April, May, and June, 1946. The claims disclosed, in each instance, that complainant had exceeded the maximum permissible cost under the cattle stabilization plan embodied in the subsidy regulation and also in MPR 574 (10 F.R. 1270). Accordingly, RFC made deductions from complainant's subsidy claims for the three months in question in the sums of $36,030.-62, $64,384.72, and $65,255.87, respectively. The RFC was required to do so by the express terms of the regulation, and the amounts of the penalty deductions are not in dispute.

Thereafter, on December 30, 1946, complainant made application to the Office of Temporary Controls for a certification authorizing RFC to release the withheld subsidies on the ground that complainant's overpayments for cattle in excess of the maximum permissible cost were due to "extenuating circumstances". At this time, the function of making such certifications was lodged with the Office of Temporary Controls, as we have stated above. The application was denied by the Temporary Controls Administrator. After the function of passing on such applications was transferred by Executive Order 9841 from the Office of Temporary Controls to RFC, complainant renewed its application before RFC. By letter dated July 16, 1947, RFC denied the application, and after request for reconsideration this denial was reaffirmed by letter dated January 21, 1948.

Under date of September 14, 1948, complainant filed with RFC its protest against the action of RFC in denying the application for release of the withheld subsidy payments. By letter dated October 20, 1948, RFC denied the protest. Claiming to be aggrieved by such denial, Merchants Packing Company filed the present complaint in this court on November 19, 1948.

■ Only brief reference need be made to a suggestion by respondent that the Emergency Court of Appeals lacks jurisdiction of the complaint. We have hitherto held, in a series of cases, that the subsidy regulation was issued pursuant to § 2 (e) of the Emergency Price Control Act of 1942, 56 Stat. 26, 50 U.S.C.A.Appendix, § 902(e), and that a ruling or determination by RFC thereunder denying a subsidy claim in whole or in part is in effect a "regulation or order under section 2," subject to protest under § 203(a) of the Act, 50 U.S.C.A.Appendix, § 923(a), and to review in the Emergency Court of Appeals under § 204(a), 50 U.S.C.A.Appendix, § 924(a). Belle City Packing Co. v. R.F.C., Em. App.1948, 169 F.2d 413, and cases cited page 414. Such review by us may involve interpretation of the terms of the subsidy regulation, for the regulation has the force of law binding on the subsidy-paying agency; and if RFC's determination or "order" denying a subsidy claim is based upon an erroneous application of the regulation, such order may be set aside by us as "not in accordance with law". Likewise, if a determination or order denying a subsidy claim is based upon factual findings lacking in substantial evidentiary support, such order may be set aside by us as being, in the words of the statute, "arbitrary or capricious". Though the Price Control Act terminated on June 30, 1947, 60 Stat. 664, the jurisdiction of this court in such cases is preserved by § 1(b) of the Act, 50 U.S.C.A.Appendix, § 901(b), since the protest and complaint are founded upon an asserted "right" in complainant, with a corresponding "liability" of the subsidy-paying agency, incurred under the subsidy regulation prior to such termination date.

■ In the case at bar the order protested was the ruling of RFC denying complainant's application for a certification authorizing the release of the withheld subsidies on the ground of extenuating circumstances. As above appears, the authority to make such certifications was originally vested in the Price Administrator and later transferred by Executive Order to the Office of Temporary Controls. We think that an order by the Price Administrator or by the Temporary Controls Administrator denying such an application

would have been deemed an order under § 2 of the Price Control Act for purposes of protest and review, since such order would have been in the course of the administration of the subsidy regulation, which itself had been issued pursuant to authority of § 2(e) of the Act. However, if the denial of the application for discretionary relief had been made by the Price Administrator, or by the Temporary Controls Administrator, we suppose that the protest against the order of denial would have had to be lodged with the Price Administrator, or the Temporary Controls Administrator, as the case might be, and that, in any complaint filed in this court upon denial of such protest, the Price Administrator, or the Temporary Controls Administrator, as the case might be, would have had to be named as a respondent. Cf. Illinois Packing Co. v. Bowles, supra, Em.App.1945, 147 F.2d 554. This latter point has become academic by reason of the ultimate transfer to RFC of the function of passing on such applications.

■ Though we have jurisdiction of the complaint, the scope of our review in this case is a narrow one. The protest is directed solely against the ruling by RFC denying complainant's application for discretionary relief because of extenuating circumstances. No objection is raised in the protest to the validity of the underlying subsidy regulation or of the provisions of Directive 41, as amended. The only objection set forth in the protest is that the facts alleged constituted "extenuating circumstances", warranting discretionary relief from the penalty deductions. Therefore the most that we may inquire into is whether, on the facts shown, respondent was "arbitrary or capricious" in concluding that complainant had failed to establish that its lack of compliance with the regulations as to maximum permissible cattle costs was due to "extenuating circum-

stances".[3] Under § 204(a) of the Act, we may consider only such objections to the protested order as were set forth in the protest. Great Northern Co-op Ass'n v. Bowles, Em.App.1944, 146 F.2d 269, 272.

Complainant attempted to establish that its lack of compliance was due to grading difficulties resulting from the unexpected curtailment of its chilling facilities, whereby the beef had to be graded "hot", in which condition the characteristics of choice or AA grade beef would not yet be apparent except to the most expert graders. Complainant's president explained in an affidavit that, in the custom killing business, the inadequacy of chilling facilities was not of great consequence, since much of the meat was going to sausages "and the grades did not matter." But when, due to the issuance of Amendment 69 to RMPR 169, complainant was forced to abandon the custom slaughtering business on April 1, 1946, the lack of adequate chilling facilities produced, so he claims, almost insurmountable grading difficulties for a straight slaughtering business specializing in the top grades of beef. He stated that, especially in the case of high grade beef, since the differentiation between the top good grade and the low choice grade is thin, such beef "can be graded right only after chilling at least for 24 hours and better still 48 hours." Complainant's expert cattle buyer, in his affidavit, stated:

"In the case of the higher quality cattle, accurate grading of the dressed out carcass is possible only after chilling. Beef carcasses should not be graded until they have been chilled for 48 hours. Only after the carcass has been 'firmed-up' can the elements which enter into grading be properly judged. These are conformation, finish and quality which include shape of the carcass, heaviness of choice cuts, color of meat, extent of marbling, the amount, color and texture of fat, character of bones, etc.

3. If we should decide this issue in complainant's favor, the only relief we could afford would be to vacate the order denying the protest and to remand the case to the RFC with direction to reopen its consideration of complainant's applica-

tion and to make the further necessary determinations whether the release of the subsidy withheld, or a portion thereof, would be inconsistent with the stabilization program, and, if not, how much of the withheld payments should be released.

914

The longer a carcass chills, the more clearly these features, and therefore, the true grade of the animal appears."

Notwithstanding the inadequacy of the capacity of complainant's holding cooler which, under the order of the Meat Inspection Division above referred to, had been curtailed to 140 carcasses, complainant continued to conduct its slaughtering operations at or near its plant capacity of 240 head a day. The result was that the beef had to be graded for the most part after only 12 to 14 hours of chilling. It would seem that complainant could not have chilled the meat adequately according to its own asserted standards even if its original cooler capacity had not been curtailed by the order of the Meat Inspection Division. Throughout the months' in question the slaughterer continued to complain of the grading by the federal inspectors and from time to time supervisors came to the plant to regrade the beef before the grading certificates were issued. In some instances this regrading resulted in raising the grade from good to choice, but the record is somewhat vague as to how often this occurred. Complainant asserted that in many instances, due to the aforesaid inadequate capacity of the holding cooler, beef had to be shipped out before it could be regraded.

After an attentive examination of the record, we do not think that respondent was "arbitrary or capricious" in its conclusion that the inadequacy of complainant's chilling facilities, when slaughtering operations were conducted at full capacity, was not an "extenuating circumstance" within the meaning of the regulation. Furthermore, without stating the evidence in greater detail, we think complainant has failed to establish its major contention that, had its chilling facilities not been curtailed by the unforeseen order of the Meat Inspection Division, a sufficient amount of its beef, properly chilled, would have been up-graded by the government graders from good to choice so as to bring complainant in compliance with the provisions of the regulation as to maximum permissible cost of cattle. The evidence on this point was somewhat speculative and the inferences to be drawn therefrom quite debatable.

A judgment will be entered dismissing the complaint.