202 F.2d 429
 HYGRADE FOOD PRODUCTS CORP.
v.
RECONSTRUCTION FINANCE CORP.
 No. 613.
 United States Emergency Court of Appeals.
 Heard at New York City December 8, 1952.
 Decided February 10, 1953.
 
 Rosalind Kramer, New York City, for complainant.
 Maurice S. Meyer, Atty., Department of Justice, Washington, D. C., with whom Marvin C. Taylor, Atty., Department of Justice, Washington, D. C., was on the brief, for respondent.
 Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.
 McALLISTER, Judge.
 
 
 1
 This case comes again before the court for review after remand and subsequent hearing before the Reconstruction Finance Corporation. See Hygrade Food Products Corp. v. Reconstruction Finance Corp., Em.App.1952, 196 F.2d 738. On the former review in this court, it was held that the action of the Reconstruction Finance Corporation in withholding subsidies from complainant was arbitrary, since it appeared that the record disclosed no standards upon which respondent based its rejection of the major part of complainant's claim. On the subsequent hearing, additional evidence was introduced by both parties, and respondent again denied the subsidies sought.
 
 
 2
 A preliminary observation may clarify the issue. As heretofore outlined in prior cases, the maximum costs of cattle purchases permissible by the regulation of the Office of Price Administration were not based upon the actual live weight of the cattle but, rather, upon a live weight, computed by formula, from the weight of the dressed carcass.[1] The live weight, as calculated by formula, might be considerably less than the actual live weight when purchased, as a result of shrinkage or loss of weight from time of purchase to time of slaughter. It might, therefore, result that although a purchaser had not actually paid excess costs for cattle, nevertheless, if the weight of the dressed carcass was less than a certain weight, computed by formula, it would appear that the purchase price per pound was in excess of that permitted by the regulation; and it would so be held by the price control authorities.
 
 
 3
 Complainant's cattle costs, as computed by formula, were in excess of that permitted by the regulation of the Office of Price Administration. In such a case, subsidies otherwise payable by law to a slaughterer are withheld on the ground that such excess costs are in violation of the regulation. However, the regulation provided that where maximum permissible costs had been exceeded by a slaughterer, it could apply for a release of subsidy payments withheld from it on the ground that the payments which it had made in excess of the maximum permissible costs were due to "extenuating circumstances." Many factors might cause loss of weight, or shrinkage, in cattle between the time of their purchase and the time of slaughter. In this case, delay of certain of the cattle in transit due to a railroad strike, their loss of weight, and, accordingly, their excess costs, were held attributable to extenuating circumstances. Denial of the subsidies now sought by complainant was based upon the ground that the excess costs for a considerable number of the cattle slaughtered were not attributable to extenuating circumstances.
 
 
 4
 For slaughterers whose excess costs were not due to extenuating circumstances, the regulations provide a sliding scale of penalty deductions from subsidies payable during the accounting period as follows: For excess costs ¼ of 1% or less, a deduction of 10% of the entire subsidy claim for the accounting period; for excess costs of ¼% to and including 1%, a 30% deduction; for excess costs of 1% to and including 2%, a 60% deduction; for excess costs greater than 2%, a 100% deduction.
 
 
 5
 In the original hearing before the Reconstruction Finance Corporation, thirty-five lots of cattle were in question. The Reconstruction Finance Corporation found that excess costs for twenty-five of these lots were due to extenuating circumstances resulting from delayed shipments because of a railroad strike, but denied subsidies for the other ten lots on the ground that no such extenuating circumstances affected them.
 
 
 6
 Because of the recognition on the part of respondent of the extenuating circumstances affecting those lots above mentioned, respondent released a portion of the withheld subsidies, in the amount of approximately $27,500, but denied almost two-thirds of the amount claimed by complainant. In our prior opinion in the case, we held that since we were unable to ascertain, from the record, any standards adopted by respondent in rejecting the claim, or any reasons for its decision, the case should be remanded for the introduction of further evidence, if the parties so desired, and for a determination based upon the evidence.
 
 
 7
 On the hearing after remand, respondent, as stated above, again denied the balance of the subsidies claimed. The reasons for its denial were that no extenuating circumstances appeared to warrant any further payment in addition to the amount already released to complainant.
 
 
 8
 The shipments of all the cattle in question — those for which subsidies were allowed, as well as those for which they were denied — covered the June 1946 accounting period. It appears from the evidence that these lots of cattle were considered by the Reconstruction Finance Corporation as being in three categories: A. lots which were delayed in transit during the June 1946 accounting period because of the railroad strike; B. lots which were not delayed in transit, for which complainant had paid in excess of the maximum permissible costs, during the June 1946 accounting period; and C. lots which were not delayed in transit, which were purchased during the June 1946 accounting period, and for which no excessive costs had been paid. Hereafter, we shall designate the lots, in the categories above mentioned, respectively, as A, B, and C.
 
 
 9
 With respect to the lots delayed in shipment — in category A — the excess costs were allowed by the Reconstruction Finance Corporation, and a certain amount of the subsidies for such lots was released because of the extenuating circumstances caused by the railroad strike. However, the entire subsidy on these lots was not released, and it is the refusal to release this amount which gives rise to the present controversy.
 
 
 10
 With regard to the portion of subsidy withheld on the lots in category A, the Reconstruction Finance Corporation justified its action as follows. It first grouped the lots for the June 1946 accounting period in the other two categories, B and C — which were not delayed in transit — including those for which excessive costs were paid, as well as those lots which were not purchased at excess costs, and determined the excess costs of all of these lots, as a lump. When the percentage of such excess costs was ascertained, it was applied not only to these lots, B and C, but, in addition, to those lots — in category A — which were delayed in transit, the excess costs of which had previously been found by the Reconstruction Finance Corporation to be due to extenuating circumstances. The sliding scale penalty deductions heretofore mentioned were then applied to all of the cattle shipped during the accounting period, including those delayed in shipment because of the strike, which had been considered by the Reconstruction Finance Corporation as entitled to subsidy because of the extenuating circumstances. The application of this penalty, therefore, reduced the amount of the subsidy which otherwise would have been payable on the lots in category A.
 
 
 11
 Complainant contends that the sliding scale penalty deductions should not be applied to those lots whose excess costs were held to be due to extenuating circumstances, but only to the other two categories which, lumped together, disclosed payment of excess costs; and it is submitted that it was arbitrary on the part of the Reconstruction Finance Corporation to apply a formula of sliding scale deductions to the lots of cattle, the excess costs of which were due to extenuating circumstances. We agree with complainant's contention.
 
 
 12
 In applying its formula, it appears logical and proper for the Reconstruction Finance Corporation to determine the excess costs of cattle in categories B and C, shipped during the accounting period, and, after computing the percentage of such excess costs, apply the sliding scale penalty deductions to them in accordance with the regulations. But it is a distortion of the formula, after excusing excess costs because of extenuating circumstances, of the lots in category A, to apply the sliding scale penalty deductions computed from the excess costs of categories B and C, in order to reduce the subsidy otherwise payable on category A.
 
 
 13
 The Reconstruction Finance Corporation submitted certain reasons as to why it used the above method of applying the penalty deductions. It contended that, while the excess costs of certain cattle shipped were due to extenuating circumstances, nevertheless, only a part of such excess costs was due thereto, and, accordingly, only a part of such excess costs could be excused. The way in which respondent arrived at this conclusion was by computations based upon the assumption that, even in those lots of cattle delayed by the railroad strike, complainant had exceeded the allowable costs at the time of purchase. As to three lots — a comparatively minor portion of these cattle — this appears to be the fact. Because of this fact, respondent evolved a formula for watering down the "extenuating circumstances" resulting from the delay caused by the railroad strike in the following manner. As has been mentioned, the lots of the cattle which were not delayed by the strike disclosed excess costs not due to extenuating circumstances, for which subsidies were not allowed. These are not now in controversy. Respondent ascertained the percentage of excess costs on these disallowed lots, and then, considering that the percentage of excess costs should be the measure of the degree of noncompliance with permissible costs for all cattle shipped during the accounting period in question, applied such percentage, and the sliding scale penalties resulting therefrom, to all the cattle shipped during the period, including those which had been delayed by the railroad strike, and which, as a result thereof, had sustained abnormal tissue shrinkage, and, accordingly, by formula, had disclosed excess costs, due to extenuating circumstances. It does not, however, follow, because three lots of the cattle in transit which were delayed by the strike disclosed excess costs or overpayments, that all cattle delayed by the strike should have penalties applied on the basis of the percentage of excess costs of the cattle which suffered no delay in transit, and concerning which there were no extenuating circumstances. The three lots above mentioned, having excess costs, were not disallowed for subsidy by the Office of Temporary Controls, the government agency having jurisdiction, and upon whose determination the Reconstruction Finance Corporation, as fiscal agent, based its decisions to release subsidies. It is possible that the Office of Temporary Controls considered that such excess costs or overpayments, taken with the other overpayments on delayed or allowed lots, were due to extenuating circumstances. If it did not arrive at such a conclusion, the reason why it considered the excess costs of the three lots as due to extenuating circumstances, is undisclosed. In any event, there appears no justification, in view of the conclusion as to extenuating circumstances, why the Reconstruction Finance Corporation should distort its formula and, because of the three lots, reduce the subsidy payable on all cattle delayed by the strike, on which the overpayments were excused.
 
 
 14
 It is no criticism of the regulations to observe that the ascertainment of the live weight of the cattle, computed by a formula from the dressed carcass, and the further ascertainment of the price paid for live cattle from computations based on the dressed carcass, might well result in figures which would vary considerably from the actual weight of the cattle and the actual price paid. Such computations, as far as the real situation goes, result in a somewhat uncertain conclusion at best. Furthermore, it is impossible to conclude, even with a fair degree of approximation, how much loss of weight or deterioration of grade result from delays in rail transit of cattle during periods of several days; and any conclusions on this score would be more uncertain than those resulting from the formula computing live weight costs of cattle from the dressed carcass weights. When such delays in transit cause loss of weight and deterioration of grade, and, because of the formula applicable, result in excess costs, which are found by the proper government agency to be due to extenuating circumstances, it is merely splitting guesses to draw conclusions as to how much of the excess costs of cattle, computed by formula, were due to the delays caused by the railroad strike, and how much, because of actual payment of excess costs at time of purchase; and any such tenuous conclusions, certainly, could not be said to be sustained by the evidence.
 
 
 15
 Having found that the cattle in question suffered loss of weight and shrinkage because of delays in transit on account of the railroad strike, and that the excess costs were due to extenuating circumstances, the Reconstruction Finance Corporation should direct the release and payment of the withheld subsidy on such cattle, which amounts to $7,467.76, without regard to the excess costs of the lots concerning which there were no extenuating circumstances.
 
 
 16
 In accordance with the foregoing, a judgment will be entered setting aside the order which denied the protest, and remanding the cause to the Reconstruction Finance Corporation for further consideration of, and action upon the protest, in consonance with this opinion.
 
 
 
 Notes:
 
 
 [1]
 See Federated Meat Corp. v. Fleming, Em.App.1947, 159 F.2d 725