269 F.2d 676
 Frank L. SMITH
v.
Franklin FLOETE, Administrator, General Services Administration, Successor to Reconstruction Finance Corporation.
 No. 674.
 United States Emergency Court of Appeals.
 Heard at Portland, Oregon, May 4, 1959.
 Decided August 20, 1959.
 
 Frank E. Magee, Portland, Or., Walter J. Cosgrave, Portland, Or., on the brief, for complainant.
 Maurice S. Meyer, Atty., Department of Justice, Washington, D. C., Frederick N. Curley and Anthony L. Mondello, Attys., Department of Justice, Washington, D. C., on the brief, for respondent.
 Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.
 MAGRUDER, Judge.
 
 
 1
 Frank L. Smith claims to be aggrieved by the official act of respondent on July 11, 1958, in his capacity as successor to Reconstruction Finance Corporation (71 Stat. 647), in denying Smith's protest to the action of RFC in declining to pay to Smith certain claims for livestock slaughter payments provided for in Revised Regulation No. 3, as amended. 10 F.R. 4241. In many previous cases we have had occasion to point out the close interrelationship between meat subsidies and the price control program. For extended discussion of the origin, legal basis, purposes and mechanisms of the meat subsidy program, we refer to our opinions in Armour & Co. v. Bowles, Em. App.1945, 148 F.2d 529, certiorari denied 1945, 325 U.S. 871, 65 S.Ct. 1411, 89 L.Ed. 1989; Illinois Packing Co. v. Bowles, Em.App.1945, 147 F.2d 554; Illinois Packing Co. v. Snyder, Em.App. 1945, 151 F.2d 337; Earl C. Gibbs, Inc. v. Defense Supplies Corp., Em.App.1946, 155 F.2d 525, certiorari denied 1946, 329 U.S. 737, 67 S.Ct. 51, 91 L.Ed. 637; Federated Meat Corp. v. Fleming, Em.App. 1947, 159 F.2d 725; William Schluderberg-T. J. Kurdle Co. v. RFC, Em.App. 1948, 169 F.2d 419, certiorari denied 1948, 335 U.S. 846, 69 S.Ct. 68, 93 L.Ed. 396; Merchants Packing Co. v. RFC, Em.App.1949, 176 F.2d 908, and Evergreen Meat Co. v. RFC, Em.App.1951, 188 F.2d 368. A summary statement of the basis of our jurisdiction in these subsidy cases, which has not been challenged here, is contained in Merchants Packing Co. v. RFC, supra, 176 F.2d at page 912.
 
 
 2
 The subject matter of this case is quite ancient history, even though it is not disputed that the present action is timely. The administrative transcript contains a letter from RFC to Smith dated June 25, 1951, embodying an order denying Smith's protest. But Smith says he did not receive the letter and the government was unable to show that it had ever been mailed; the government conceded, and the Ninth Circuit held, that as a matter of law the protest was still pending. United States v. Smith, 1958, 254 F.2d 930. The respondent then issued a new letter order denying the protest, dated June 11, 1958, and this complaint was filed promptly thereafter.
 
 
 3
 During the years in question, 1945 and 1946, the complainant did business in Portland, Oregon, as a wholesale meat dealer; he did not operate a federally inspected plant, but rather had livestock custom-slaughtered for him. On April 25, 1945, the Office of Price Administration issued "Control Order 1" which defined persons like Smith as Class 2 slaughterers; Supplement 1 to Control Order 1 then fixed quota bases for such slaughterers. 10 F.R. 4715. The purpose of Control Order 1 was stated to be the allocation of available livestock so as to increase the production of meat in federally inspected plants, which could be used for armed services consumption and interstate shipment, by means of limiting the production by other types of sources. Section 10(c) of the Order specifically provided as follows:
 
 
 4
 "If any Class 2 slaughterer, during any quota period, slaughters livestock of any species in excess of his quota for that species for that period (including any carryover from the preceding period in accordance with (a) above), his quota for that species for the next period, shall be reduced by the amount of the excess. If the amount of the excess is greater than his quota for that species for that period, he may not use any part of his quota for that species for that period, nor for any succeeding period until the total of his subsequent quotas for that species exceeds the amount of the excess."
 
 
 5
 The Office of Economic Stabilization, which had been given overriding authority over the entire subsidy and stabilization program by Executive Order 9250 (7 F.R. 7871 — see our discussion in Earl C. Gibbs, Inc. v. Defense Supplies Corp., supra, 155 F.2d at page 527) had issued its Directive 41 on April 23, 1945. 10 F.R. 4494. Section 7(b)(2) thereof included the following mandate:
 
 
 6
 "Upon a nisi prius determination in a civil action or proceeding (including a proceeding before a hearing commissioner) against a subsidy applicant, that such applicant has violated any substantive provision of an Office of Price Administration meat or livestock regulation or order, the Office of Price Administration shall certify the determination to Defense Supplies Corporation, including the period of time during which the violation is found to have occurred. Defense Supplies Corporation shall thereupon withhold payment on all subsidy claims of the applicant for the accounting period in which the violation is found to have occurred." (Italics added.)
 
 
 7
 This provision of the Directive of the Office of Economic Stabilization became binding upon RFC when it succeeded Defense Supplies Corporation as the subsidy-paying agency. The quoted language allowed no discretion in the matter; the withholding of subsidies was automatic, upon receipt of an appropriate certificate from the OPA. Assuming that § 7(e)(4) as added by Amendment 4 to Directive 41 (11 F.R. 4340) is otherwise applicable here, and that by the effect of Executive Order 9809 (11 F.R. 14281) and of Executive Order 9841 (12 F.R. 2645), 50 U.S.C.A.Appendix, § 601 note, there was transferred to RFC this function of the Price Administrator to certify that the "slaughterer's excess slaughter was due to extenuating circumstances and that the release of the subsidy withheld would not be inconsistent with the stabilization program," it is enough to say that, as found by the hearing examiner, Smith exceeded his authorized quota for June, July and August, 1945, by an amount far in excess of 3 per cent of such quota, and therefore the OPA, or its successor, had no dispensing power in the premises. Nor do we find in the transcript any document in which Smith even purported to apply for discretionary relief, citing this amendment.
 
 
 8
 The record contains an order by a hearing commissioner of the OPA dated May 27, 1946, finding that Smith had violated the quota limitations under Control Order 1 by his slaughter of cattle and calves during the months of June, July and August of 1945. It is clear that there was a large excess of slaughter by the complainant for the month of June, 1945. Whether or not this was in good faith and "due to inadvertence", as claimed by Smith, seems to be wholly irrelevant. The inescapable fact is that the duly established quota was exceeded. The Commissioner reached his conclusion as to July and August by carrying over the balance of overkill as prescribed by the plain language of Control Order 1, § 10(c).
 
 
 9
 In his complaint now before us and in his briefs and argument, Smith claims that the effect of that section of Control Order 1 is to impose a duplicating penalty upon slaughterers, and seeks to challenge its validity on several grounds. We take it that Control Order 1 was issued by the Price Administrator under the authority of § 2 of the Emergency Price Control Act of 1942 (56 Stat. 24); if so, this court, pursuant to its strictly statutory jurisdiction, has power to consider a proper challenge to the validity of § 10(c) of Control Order 1.
 
 
 10
 We will assume in complainant's favor what is not entirely clear from Executive Orders 9809 and 9841 referred to above, that the functions of the Price Administrator appropriate to considering the validity of the Control Order were transferred to RFC rather than to the Secretary of Commerce, and hence that RFC, or its successor General Services Administration, was the proper respondent in judicial review of Control Order 1; but there still seems to be another fatal objection to complainant's argument. We cannot find any protest filed in this case which undertook to challenge the validity of § 10(c) of Control Order 1; and this court has many times declined to consider a question of validity of any provision of a regulation or order which was not raised in a protest filed with the administrative agency. See, for example, Bowman v. Bowles, Em.App.1944, 140 F.2d 974, 977, certiorari denied 1944, 322 U.S. 742, 64 S.Ct. 1144, 88 L.Ed. 1575.
 
 
 11
 The Emergency Price Control Act in § 203(a) requires the filing of "a protest specifically setting forth objections to any such provision", and in § 204(a) limits our jurisdiction by providing that "[n]o objection to such regulation, order, or price schedule * * * shall be considered by the court, unless such objection shall have been set forth by the complainant in the protest". 56 Stat. 31. The only document in the record which is labeled a protest, and treated as such by the agency, is a telegram sent to the RFC on December 15, 1950. Certainly this cannot be said to call to the attention of the administrative agency any alleged invalidity of § 10(c) of Control Order 1. Two letters which complainant points to, one from Smith to Slaughter Control Program in Washington dated December 23, 1946, and the other from Smith's counsel to RFC, Office of Defense Supplies, dated December 16, 1947, are similarly deficient. Moreover, these letters are in both form and content petitions for equitable relief by the agency, not protests against the validity of any order. We cannot see how these two letters, or either of them, can be considered to be the formal "protest" contemplated by the statute, or can be incorporated as part of the telegraphic protest. As we said in Bowman v. Bowles, supra, 140 F.2d at page 977:
 
 
 12
 "This Court is expressly limited to a consideration of objections to such regulation, order, or price schedule * * * before the Administrator, Sec. 204(a). One purpose of the protest procedure is `to give the Administrator a chance to reconsider any challenged provisions * * * in the light of further evidence or arguments which may be advanced by the protestant.' Another purpose of the protest procedure is the development of a record on which this Court may review the validity of challenged regulations. Inherent in these purposes and statutory provisions is the necessity for a protestant to specify clearly and intelligibly the objections he desires to make. In considering a protest, the Administrator therefore is required to consider only those points which are set forth clearly; he is not obliged to search the record with care to find what objections may be present by way of innuendo, inference, or intimation."
 
 
 13
 See also Mirman v. RFC, Em.App.1952, 194 F.2d 290.
 
 
 14
 Another and distinct claim by Smith in this case relates to subsidies allegedly owing for the month of May, 1946. The telegraphic protest objects to the denial by RFC of a claim for subsidy payments for June, 1946. This must have been an inadvertence, since the claim for that month, as corrected, was approved by RFC and credited to complainant's account. Respondent's order denying the protest, as well as all briefs filed in this court, are based upon the assumption, which we accept, that complainant intended to protest the denial of his claim for subsidies for the month of May, 1946. But it does not appear that any valid claim for this month has been rejected by the subsidy-paying agency. It is clear that complainant's original subsidy claim for the month contained incorrect slaughter and cost statistics; all that RFC did was to request the applicant to submit a corrected claim, which Smith has stubbornly refused to do. We find no error in the failure of RFC to pay a subsidy to Smith for May, 1946.
 
 
 15
 A judgment will be entered dismissing the complaint.