194 F.2d 290
 MIRMAN et al.
v.
RECONSTRUCTION FINANCE CORP.
 No. 561.
 United States Emergency Court of Appeals.
 Heard at Cleveland, Ohio, December 18, 1951.
 Decided February 7, 1952.
 
 Paul W. Walter, Cleveland, Ohio, with whom D. Rusk Haverfield and F. Wilson Chockley, Jr., Cleveland, Ohio, Counsel and James Perkins Parker, Co-Counsel, Washington, D. C., were on the brief, for complainants.
 Maurice S. Meyer, Attorney, Department of Justice, Washington, D. C., with whom J. Gregory Bruce, Attorney, Department of Justice, Washington, D. C., was on the brief, for Reconstruction Finance Corporation.
 Before MARIS, Chief Judge, and McALLISTER and LINDLEY, Judges.
 LINDLEY, Judge.
 
 
 1
 This cause involves claims for meat subsidy payments arising under the subsidy program created and administered pursuant to the Emergency Price Control Act of 1942, as amended, 50 U.S.C.A.Appendix, § 901 et seq.
 
 
 2
 Complainant partnership is composed of William B. Mirman, Carl Mirman, Harry Mirman and Ernest Falb. Prior to its formation, William B. Mirman and Ernest Falb were engaged in separate slaughtering activities as individual proprietors. To each had been issued a license and quota basis. On March 1, 1946 they formed the present partnership, Carl Mirman and Harry Mirman joining them. Respondent was notified of this combination of efforts on April 14, 1946, and on June 18, 1946 the separate licenses of William B. Mirman and Falb were cancelled and a new one "combining the quota bases of the above two licenses" was issued to the partnership. The "new" quotas were merely the sum total of the former individual quotas.
 
 
 3
 Although the partnership had no authorization to slaughter or to qualify for subsidies until June 18, 1946, a claim for payments for the month of May 1946 was filed in the partnership name by William B. Mirman and paid by respondent, in the sum of $1,560.46 for cattle and $326.87 for calves. Falb also filed his separate claim and received $226.20 for cattle and $7.81 for calves. Subsequently the Office of Price Administration certified to respondent that William B. Mirman had overslaughtered in May, whereupon respondent entered an order invalidating the prior payments and set up a claim receivable against him for $1,887.33. Complainant later filed claims for subsidies for the months of June and September in the total sum of $4,170.31, which were denied because complainant had been certified as having overslaughtered during those months. Claims for October, in the sum of $910.59, were allowed but credited on the outstanding claim receivable, $32.27 being allocated to interest and the balance to principal, reducing complainant's debt to $1,009.01. Complainant now asserts that the claims were improperly invalidated.
 
 
 4
 Complainant has not challenged the validity of the various pertinent regulations. As this court has many times held, it follows that the regulations are, for the purposes of this decision, valid and binding on the parties hereto.
 
 
 5
 At the outset, we are faced with the respondent's contention that the protest did not set forth objections to the invalidation of the several subsidy claims with the particularity required by Section 203(a) of the Act, 50 U.S.C.A.Appendix, § 923(a), which provides that a protest may be filed "specifically setting forth objections to any * * * provision" of a regulation or order "and affidavits or other written evidence in support of such objections." The protest, in the form of a letter addressed to respondent on December 13, 1950, is vague and mentions no specific objections to respondent's action. Its essence is thus stated: "Subject slaughterer not only disputes the amount of and reason for the Claim Receivable of the Reconstruction Finance Corporation in the amount of One Thousand Nine Dollars and one cent, but also has records of * * * a claim in the approximate amount of Four Thousand Eight-Hundred-Eighty-seven Dollars and twenty-nine cents against the Reconstruction Finance Corporation by reason of improper invalidation of subsidy claims of said slaughterer, which disputation and claim said slaughterer proposes to pursue at a subsequent time." No evidence was filed with the protest. However, despite its procedural defects, respondent credited the letter as a protest and denied it on the ground that complainant had been certified by the Office of Price Administration as having exceeded its slaughter quotas during the named periods. Office of Economic Stabilization. Directive 41, Amendment 4;[1] R. F. C. Revised Regulation No. 3, Section 7003.10(a)(4).[2]
 
 
 6
 On September 14, 1950 respondent issued Regulation No. 11, 15 Fed.Reg. 6193, providing that all protests of withheld subsidy claims be filed on or before December 15, 1950 and that the failure to file on or before such date, would be "presumed conclusively to constitute an abandonment of any claim to payment or credit."[3] The regulation provided further that this part of the regulation would "not apply to those claims on which completion of administrative action had been suspended because of referral to the Department of Justice." Since respondent's claims receivable against complainant had been assigned to the Department of Justice for purposes of collection, complainant argues that it is within the above exception to the regulatory deadline for filing protests. However, it is clear from the record that at the time when the claims receivable were delivered to the Department of Justice for collection, respondent had acted finally thereon. Obviously, therefore, complainant did not fall within the exception to the regulation, for completion of administrative action had not been suspended.
 
 
 7
 We revert to the protest. It was completely lacking in the essential requirements of the statute. As we said, in Bowman v. Bowles, Em.App., 140 F.2d 974, 977, certiorari denied 322 U.S. 742, 64 S. Ct. 1144, 88 L.Ed. 1575: "Inherent in these purposes and statutory provisions is the necessity for a protestant to specify clearly and intelligibly the objections he desires to make. In considering a protest, the Administrator * * * is not obliged to search the record with care to find what objections may be present by way of innuendo, inference, or intimation." In other words, respondent must be given a fair opportunity, at the administrative level, to meet the arguments of complainant, Lakemore Co. v. Brown, Em.App., 1943, 137 F. 2d 355, 360, in order that a comprehensive record will be developed to facilitate review by this court, Armour & Co. of Delaware v. Brown, Em.App., 1943, 137 F.2d 233, 239. In the light of these decisions, and of the lack of clarity of complainant's protest, a dismissal of the complaint on the ground that the protest was insufficient is fully justified. However, from the outset, respondent has demonstrated a commendable willingness to dispose of the claims on their merits. Despite the vagueness of the protest, a complete record of correspondence and claim sheets, together with complainant's quota bases, is before us. In its brief respondent has largely dealt with the merits, relegating the procedural questions to a secondary position. Consequently, although respondent has not waived its right to challenge the sufficiency of the protest, inasmuch as the administrative transcript is present and the merits have been submitted, we prefer to dispose of the substantive questions presented.
 
 
 8
 In this respect we are confronted with but one question. Were the certifications by the O.P.A. that complainant had overslaughtered in May, June and September, 1946, "arbitrary and capricious" within the meaning of Section 204(b) of the Act, 50 U.S.C.A.Appendix, § 924(b)? This question is to be resolved by determining whether they are supported by substantial evidence, viewing the record as a whole, Saker v. Woods, Em.App., 1948, 169 F.2d 131; Wylie v. Bowles, Em.App., 1945, 147 F.2d 143. Furthermore, in our disposition, we must bear in mind that complainant has produced no proof contradicting O.P.A.'s finding. Although the Office of Price Administration is not a party here, under Armour & Co. v. R. F. C., Em.App., 162 F.2d 918, we must look to the evidence relied upon by that office in issuing its certificate, for that evidence is, ultimately, the foundation of respondent's order invalidating complainant's claims. O. E. S. Directive 41, Amend. 4; R.F.C.Rev.Reg.No. 3, Sec. 7003.10(a)(4).
 
 
 9
 As stated, William B. Mirman and Ernest Falb were individual proprietors until early spring of 1946. At that time, they and Mirman's sons formed the partnership. They applied for, and subsequently received, slaughter quotas for the partnership, which, however, were not issued until June 18. Therefore, during the month of May 1946, Mirman and Falb were authorized to slaughter only under their individual quotas. Mirman's quotas for the month of May 1946 were: cattle, 43,381 pounds and calves, 22,578 pounds. He filed subsidy claims for this month, for cattle 57,080 pounds and for calves, 33,190 pounds. Although this claim was filed in the name of the partnership, O.P.A. in certifying that Mirman had overslaughtered, in the absence of evidence to the contrary, properly viewed it as his personal claim, for the partnership was not authorized to slaughter until June 1946. Therefore, in May, Mirman overslaughtered 13,699 pounds of cattle and 7,137 pounds of calves. Thus, the subsequent invalidation of Mirman's claim for May and the consequent claim receivable for the amount already paid him, were supported by substantial evidence.
 
 
 10
 Falb continued to slaughter in May, and filed claims for subsidies for 14,400 pounds of cattle and 710 pounds of calves. His quotas for these were 25,000 and 600 pounds respectively. Consequently he underslaughtered 10,600 pounds of cattle and overslaughtered 110 pounds of calves during the period. He was paid the amounts he claimed for May 1946 and these payments have not been invalidated.
 
 
 11
 During June, Mirman and Falb were authorized to slaughter as a partnership. The letter accompanying their new quotas stated that their old licenses had been cancelled and a new license issued "combining the quota bases of the above two licenses * * *." Therefore, by the express terms of the letter, the "new" quota bases were a consolidation of the "old." Consequently, any effect on the "old" brought about by the respective over and underslaughtering in May, 1946, should have been carried over and applied to or deducted from the "new" quota bases. Control Order No. 2, 11 Fed.Reg. 4657, makes specific provisions as to the effect of over and underslaughter in subsequent periods. Thus, Section 9(a), 11 Fed.Reg. 4661, provides that, in the case of underslaughter during any given period, the slaughterer shall be entitled to slaughter in excess of his next period quota to the extent of the amount underslaughtered in the immediately preceding period up to 5% of the preceding quota and 9(b), 11 Fed.Reg. 4662, that the amount overslaughtered in any given period shall be deducted from the quotas for subsequent periods until the prior excess shall have been accounted for. Applying these regulations, in conjunction with the facts indicated for May 1946, to the partnership quotas for June, the following is the result:
 
 
 12
 Cattle

 Partnership quota base ............... 73,748
 Percentage of base allowed by
 Amendment 2 to Supplement 1
 of Control Order 2, 11 F.R. 6136 85%
 ______
 Net quota base ....................... 62,686
 Less Mirman's overslaughter .......... 13,699
 ______
 48,987
 Plus 5% of Falb's May quota (25,000) . 1,250
 ______
 Total permissible slaughter for
 June 1946 .......................... 50,237
 ======

 Calves

 Partnership quota base ............... 27,086
 Percentage of base allowed by
 Amend. 2, supra .................... 85%
 ______
 Net quota base ....................... 23,023
 Less Mirman's and Falb's overslaughter
 for May (7,137+110) ................ 7,247
 ______
 Total permissible slaughter for
 June, 1946 ........................... 15,776
 =======
 
 
 13
 The partnership actually slaughtered 71,110 pounds of cattle and 27,780 pounds of calves. Thus, in June, complainant overslaughtered 20,873 pounds of cattle and 12,004 pounds of calves. It follows that O. P.A.'s certification of overslaughter during this period was not arbitrary or capricious.
 
 
 14
 For the month of September 1946 the partnership quota bases were 81,230 pounds of cattle and 25,414 pounds of calves. Applying to these figures were the percentages established by Amendment 4 to Supplement 1 of Control Order No. 2, 11 Fed. Reg. 9691, i. e. 90% for each species. Thus, initially, complainant was entitled to slaughter 73,125 pounds of cattle and 22,873 pounds of calves. However, due to the overslaughter provisions of Control Order No. 2, the previous overslaughter was deductible from these amounts, resulting in a net permissible slaughter of 52,252 pounds of cattle and 10,869 of calves. In fact, however, complainant slaughtered in this month 67,715 pounds of cattle and 20,005 of calves, an overslaughter of 15,463 pounds of cattle and 9,136 of calves. Obviously, O.P.A.'s certification of overslaughter during this period was not arbitrary or capricious.
 
 
 15
 Complainant asserts that the claims filed by Falb for May should not have been viewed as separate claims but should have been considered a part of the partnership report, for, it says, his slaughter figures were also included in the partnership claim. But the reports filed by Mirman and Falb do not bear out the assertion that Falb's claim was a part also of Mirman's purported partnership claim. Thus, Mirman reported partnership slaughter of Grades B and C cattle in the amounts 693 and 2,517 pounds respectively. Falb reported slaughter of 3,991 and 3,610 pounds of Grades B and C respectively. Thus, Falb's greater amount clearly could not have been a part of Mirman's lesser amount.
 
 
 16
 Although complainant asserts that it understood that the new quotas were to be retroactive to May 1, 1946, we find no support in the record to support this position. On the contrary, for the purpose of participating in the subsidy program, the two were, in May, still individual slaughterers and bound to comply with their individual quota bases. But, assuming arguendo, that they were entitled to slaughter as partners in that month, the result would remain the same. The "partnership" quotas for May would have been 68,381 pounds and 23,178 pounds for cattle and calves respectively. Pursuant to Supplement 1 of Control Order No. 2, 11 Fed.Reg. 4666, slaughterers were permitted to slaughter 100% of their quota bases during that month. Adding the respective amounts slaughtered by Falb and Mirman, a total of 71,480 pounds of cattle and 30,425 pounds of calves is obtained. Thus, as a "partnership," there was an overslaughter of 3,089 pounds of cattle and 7,247 pounds of calves. Applying these totals to subsequent periods, in accord with the carry-over provisions of Control Order No. 2, complainant is placed in non-compliance for both June and September.
 
 
 17
 Indeed, if for the month of May, Mirman and Falb are viewed as individual slaughterers and then, upon authorization to slaughter as a partnership, are given a clean slate, according to the record, they would still have violated their quotas for the months of June and September to the extent of: June, cattle 8,424 pounds, calves 4,757 pounds; September, cattle 3,014 pounds and calves 1,889 pounds. Thus, taking any view of the record, it is clear that the Office of Price Administration was fully justified in certifying that complainant had overslaughtered during May, June and September 1946. When it did so certify, respondent had no choice other than to invalidate the payments made and deny the claims. O. E. S. Directive 41, Amend. 4; R.F.C.Rev.Reg.No. 3, Sec. 7003.10(a)(4).
 
 
 18
 In its final attempt to explain its overslaughter for May, complainant relies on a form letter sent to all slaughterers by the then Administrator of the Office of Price Administration, at the time of reimposition of slaughter quota bases, in April 1946. That communication said: "In brief, this Order (i. e., Control Order No. 2) restricts the slaughter of each species of livestock during any quota period by Class 2 slaughterers to a certain percentage of the slaughter during the corresponding period of 1944. * * *" Complainant interpreted this letter to mean that the permissible amount of slaughter for a given period was to be determined by reference to the actual amount slaughtered in the corresponding 1944 period as contrasted with the quota bases for that period. However, the letter also specified that "affected slaughterers * * * must observe the limitations imposed by Control Order No. 2 * * *," which clearly provided that the maximum permissible slaughter quota was to be computed by reference to the quota bases for the corresponding periods of 1944. But, assuming, arguendo, that complainant was justified in so interpreting the administrator's letter, and, assuming further that such a letter negatived the express terms of the official regulation, or worked an estoppel against O.P.A. and respondent, still complainant can find no solace in it, for no proof has been introduced to show what its actual slaughter was during the corresponding period. In this situation, we must assume that the amount actually slaughtered was the amount specified in the quota bases for the corresponding 1944 period, for to do otherwise would be to indulge a presumption that complainant violated the regulations in 1944 by overslaughtering. Therefore, all our computations have been made by employing the quotas for 1944 made applicable to 1946 by Control Order No. 2.
 
 
 19
 Complainant pleads for "equitable relief." It asserts that any violations were unintentional and resulted from the complex nature of the regulations applicable to the meat subsidy program. This court possesses no broad equitable powers enabling it to grant the relief sought, and, though we sympathize with complainant in that the regulations are indeed complex, involved and ever-changing, it is basic that slaughterers are bound to know their contents and to act in compliance therewith.
 
 
 20
 In support of its plea of good faith complainant relies on Section 205(d) of the Act, 50 U.S.C.A.Appendix, § 925(d); "No person shall be held liable for damages or penalties * * * on any grounds for or in respect of anything done or omitted to be done in good faith pursuant to any provision of this Act or any regulation, order, price schedule, requirement, or agreement thereunder, * * *." However, the invalidation of subsidy claims or payments does not constitute "damages or penalties" within the meaning of this section of the Act. San Antonio Packing Co. v. R. F. C., Em.App., 1950, 182 F.2d 614.
 
 
 21
 Judgment will enter dismissing the complaint.
 
 
 
 Notes:
 
 
 [1]
 "(e) (1) Reconstruction Finance Corporation is also directed to withhold payments of subsidy claims upon certification of a District Director of the Office of Price Administration * * * that the slaughterer's report, after correction for errors, filed with the Office of Price Administration * * * pursuant to Control Order No. 2 * * * shows he has slaughtered livestock in excess of his authorized quota." 11 Fed.Reg. 4340
 
 
 [2]
 "(a)Compliance with other Regulations. Reconstruction Finance Corporation shall declare invalid, in whole or in part, any claim of any applicant who: * * *
 "(4) Is certified by the Office of Price Administration * * * pursuant to Amendment 4 to Directive 41, to have exceeded his quota for slaughter."
 
 
 [3]
 As previously suggested, complainant has not attacked the validity of any regulation. Consequently, whether, if this one were so attacked, we would have to declare it invalid, in view of the provision of the statute that protests may be filed "at any time" is a question not presented on the present record