188 F.2d 368
 EVERGREEN MEAT CO.
v.
RECONSTRUCTION FINANCE CORP.
 No. 537.
 United States Emergency Court of Appeals.
 Heard at Washington, D. C., February 23, 1951.
 Decided April 13, 1951.
 
 COPYRIGHT MATERIAL OMITTED Francis M. Shea, Washington, D. C., with whom Warner W. Gardner, Washington, D. C., was on the brief, for complainant.
 Samuel K. Abrams, Washington, D. C., Attorney, with whom Joseph M. Friedman, Sp. Asst. to the Atty. Gen. Department of Justice, was on the brief, for respondent.
 Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.
 MAGRUDER, Judge.
 
 
 1
 Evergreen Meat Company claims to be aggrieved by the action of Reconstruction Finance Corporation in denying its claims for livestock slaughter subsidy payments provided for in Revised Regulation No. 3, as amended. In previous cases we have discussed in detail various aspects of the meat subsidies which complemented the price control program under the Emergency Price Control Act of 1942, 50 U.S.C. A.Appendix, § 901 et seq. See Merchants Packing Co. v. R. F. C., Em.App., 1949, 176 F.2d 908, and cases therein cited. That case also, 176 F.2d at page 912, states summarily the basis of our jurisdiction in these subsidy cases.
 
 
 2
 Cattle slaughter subsidy payments were originally established, effective June 7, 1943, by Regulation No. 3 issued by Defense Supplies Corporation, 8 F.R. 10826. The purpose was to compensate slaughterers for a roll-back of 10 per cent in the maximum prices of carcass beef and wholesale cuts. See Earl C. Gibbs, Inc., v. Defense Supplies Corp., Em.App., 1946, 155 F.2d 525, 526. There was, however, at this time no attempt to impose direct controls on the movement of live cattle prices. As set forth in Armour & Co. v. Bowles, Em. App., 1945, 148 F.2d 529, 531-32, and in Federated Meat Corp. v. Fleming, Em. App., 1947, 159 F.2d 725, the complications encountered in the evolution of the price control program as applied to meat were apparently attributable in large part to the fact that it was deemed impracticable to establish general ceiling prices on live cattle because of the difficulty of grading cattle on the hoof, and particularly the difficulty of determining the grade of carcass beef which any individual animal would produce.
 
 
 3
 The Office of Economic Stabilization, which had been given overriding authority over the entire subsidy and stabilization program by Executive Order 9250, 7 F.R. 7871, 50 U.S.C.A.Appendix, § 901 note — see our discussion in Earl C. Gibbs, Inc., v. Defense Supplies Corp., Em.App., 1946, 155 F. 2d 525 — issued a Directive on October 25, 1943, 8 F.R. 14641, setting up a so-called cattle stabilization plan, which sought to impose indirect controls upon live cattle prices by depriving the buyer of his subsidy to the extent that his total monthly payments for all grades of cattle purchased exceeded the price ranges established for the various grades. These price ranges were fixed with a view to bringing into proper relationship the prices for live cattle and the prices for beef carcasses and wholesale cuts established in Revised Maximum Price Regulation 169, 7 F.R. 10381. The method of calculating this maximum permissible cost without diminution of subsidy is explained in some detail in Armour & Co v. Bowles, Em.App., 1945, 148 F.2d 529, 532-33, and in Federated Meat Corp. v. Fleming, Em.App.1947, 159 F.2d 725, 726. This method was adopted to avoid the practical difficulties of grading the individual cattle on the hoof. The slaughterer determined the total tonnage of beef carcasses, by grades, obtained from the cattle slaughtered during the monthly accounting period. The equivalent or "calculated" live weight of cattle in each grade slaughtered during the period was arrived at by working backward from the dressed carcass weights by the use of prescribed conversion factors or average dressing percentages, each dressing percentage being the assumed ratio of the weight of the dressed carcass of the particular grade to the live weight of the animal. The aggregate calculated live weight for cattle of each grade slaughtered during the accounting period was multiplied by the maximum price of the applicable range prices, and the amounts thus derived for each grade were added together. The resulting figure was the maximum permissible amount which the slaughterer could pay for the cattle slaughtered during the accounting period without loss of subsidy.
 
 
 4
 In conformity with the aforesaid Directive of October 25, 1943, Defense Supplies Corporation made appropriate amendments of its Regulation No. 3, 9 F.R. 1820, 1821. The subsidy regulation as it had been amended from time to time was reissued as Revised Regulation No. 3, effective January 19, 1945, 10 F.R. 4241.
 
 
 5
 Directive 28 of the Office of Economic Stabilization, effective January 29, 1945, 10 F.R. 522 went a step further, and directed the Price Administrator to incorporate the cattle stabilization plan into a price regulation, thus adding the sanctions of the Emergency Price Control Act to the sanction of loss of subsidy, in order to induce slaughterers to keep their purchases of live cattle within the prescribed range prices in the over-all monthly average. Pursuant thereto, the Price Administrator, on January 29, 1945, issued Maximum Price Regulation No. 574 — Live Bovine Animals, 10 F.R. 1270, § 2 of which provided that no person in the course of trade or business "shall pay for live cattle bought or received during any accounting period an amount higher than the maximum amount fixed by this regulation for such live cattle during such accounting period".
 
 
 6
 Defense Supplies Corporation was dissolved on July 1, 1945, and its functions transferred to its holding company, respondent RFC, by the Act of June 30, 1945, 59 Stat. 310, 15 U.S.C.A. § 611 note. Revised Regulation No. 3, as amended, was then taken over and administered directly by RFC, 10 F.R. 11155.
 
 
 7
 Effective April 1, 1946, the Office of Economic Stabilization issued Amendment 3, 11 F.R. 3102 to its Directive 41, 10 F.R. 4494, by which amendment RFC was directed to withhold payment of subsidy claims, in accordance with a prescribed sliding scale of deductions, in cases where a slaughterer's claim, on Form DS-T-55, showed an aggregate cost of cattle, for the monthly accounting period covered by the claim, in excess of the maximum permissible cost under the cattle stabilization plan embodied in MPR 574. There were thus provided automatic deductions from subsidy claims based upon costs of cattle in excess of the maximum permissible costs, as follows: Excess costs of one fourth of one per cent or less, 10 per cent deduction; excess costs of greater than one fourth of one per cent but not greater than one per cent, 30 per cent deduction; excess costs greater than one per cent but not greater than two per cent, 60 per cent deduction, and excess costs greater than two per cent, 100 per cent deduction. Section 7(b) (5) of Directive 41, as added by the aforesaid Amendment 3, and as further amended by Amendment 8, 11 F.R. 13750 and by Amendment 12, 12 F.R. 3017, provided that a slaughterer might apply to the Price Administrator at Washington, D. C., for a release of the subsidy payments which RFC had thus been directed to withhold, on the ground that the overpayment was due to "extenuating circumstances". The subsection further provided as follows: "Upon a finding by the Price Administrator that such overpayment was due to extenuating circumstances and that the release of the subsidy withheld, or a portion thereof, would not be inconsistent with the stabilization program, he may so certify to Reconstruction Finance Corporation, setting forth the amount of the subsidy to be released and thereupon such amount of subsidy shall be payable forthwith."
 
 
 8
 Accordingly, Revised Regulation No. 3 was amended by Amendment 15 issued March 21, 1946, effective April 1, 1946, so as to add to § 7003.6(b) thereof a new paragraph (3), incorporating the sliding scale deductions above referred to; and the amended subsidy regulation further provided that such deductions, or any part thereof, should be repaid to the applicant by RFC in accordance with any certifications by the Price Administrator to the effect above stated.
 
 
 9
 The function of the Price Administrator to make such certifications was, by Executive Order 9809, 11 F.R. 14281, 50 U.S.C.A. Appendix, § 601 note, issued December 12, 1946, transferred to the Office of Temporary Controls. Later, by Executive Order 9841, 12 F.R. 2645, 50 U.S.C.A.Appendix, § 601 note, issued April 23, 1947, this function was finally transferred to RFC itself. Thus, there were eventually coalesced in RFC: (1) the function of subsidy-paying agent, charged with the automatic duty to withhold certain subsidy payments by way of percentage deductions when it was disclosed that the subsidy applicant had exceeded, for the accounting period in question, the maximum permissible cost for live cattle bought by him, and (2) the function, upon application by a slaughterer who had been subject to such deductions, of finding and certifying the existence of "extenuating circumstances", etc., and of making the discretionary determination as to the amount of withheld subsidy payments to be released to the applicant. As will presently be noted, the protest by Evergreen Meat Company in the case at bar involved each of these functions of the RFC.
 
 
 10
 It appears from the allegations of the protest that Evergreen Meat Company was formed on April 8, 1946, with a structure somewhat out of the ordinary, to say the least. It was formed as a limited partnership, consisting of two general partners and some 145 retail butchers as limited partners, with the purpose, "through direct purchases in the stockyards and local slaughter, to obtain meat products, otherwise unavailable through customary distribution channels, for the retail butchers joining in the partnership." Evergreen leased at a rental of $1,000 a week an idle slaughtering plant in Brooklyn, New York, owned by Central Packing Corporation. Thereafter, its operations were confined almost entirely to the purchase of choice cattle at Chicago and Sioux City stockyards and the slaughter of the same in Brooklyn for the kosher trade. Under the partnership agreement, the limited partners would by weekly assessments bear the cost of the operations in proportion to the amount of meat distributed by Evergreen to each limited partner for his own retail butcher business.
 
 
 11
 Evergreen Meat Company duly submitted to RFC its claim for cattle slaughter subsidy payments for the months of April, May and June, 1946, in a total sum of $171,999.87. The claims revealed that for the month of April the prices of applicant's purchases of cattle had exceeded the maximum permissible cost as prescribed in MPR 574 by 2.43 per cent; for May by 3.37 per cent, and for June by 3.41 per cent. There is no dispute as to this. Therefore RFC was obliged by the mandatory sliding scale deductions embodied in the above-mentioned § 7003.6(b) (3) of Revised Regulation No. 3, as added by Amendment No. 15, to deny the applicant's claims for subsidy in full for these three accounting periods.
 
 
 12
 On December 27, 1946, Evergreen Meat Company submitted to the Office of Price Administration a petition for relief on the ground of "extenuating circumstances". The petition was denied on February 13, 1947, by the Administrator of the Office of Temporary Controls, that agency having meanwhile succeeded to the function of the Price Administrator in this respect, as above stated. After the ultimate transfer to RFC of this dispensing function, Evergreen applied to RFC for discretionary relief, in effect asking RFC to reconsider the denial of the petition for relief which had originally been submitted to the Price Administrator. On August 24, 1948, the board of directors of RFC found that the facts did not establish that Evergreen's noncompliance with MPR 574 was due to "extenuating circumstances" within the meaning of that phrase in § 7(b) (5) of Directive 41, and ruled that the withheld subsidy payments should not be released to the applicant.
 
 
 13
 Finally, on March 28, 1950, Evergreen filed with RFC its formal protest, which is the foundation of the proceeding now pending before us. By letter dated August 9, 1950, RFC denied the protest. The present complaint was timely filed on September 8, 1950.
 
 
 14
 Under § 203(a) of the Emergency Price Control Act of 1942, as amended, the formal administrative protest must specifically set forth protestant's objections to the regulation or order in question. If the protest is denied, and protestant files a complaint in this court under § 204(a), we may not consider any objection to the regulation or order unless such objection shall have been set forth in the protest. In Evergreen's protest it sought to do three things: (1) It sought to challenge the validity of § 13(c) (1) of MPR 574, in so far as that price regulation established ranges for live cattle prices which it was impossible, as alleged, for Evergreen to comply with under existing market conditions. (2) It attacked Amendment No. 15 to RFC's Revised Subsidy Regulation No. 3, effective April 1, 1946, as being arbitrary, capricious and invalid in its application to all slaughterers in Evergreen's situation, in so far as Amendment 15 provided for a deduction of 100 per cent of any subsidy claim where the maximum permissible cost of cattle was exceeded by over two per cent; its contention in this respect being that, with Amendment No. 15 stricken down, Revised Regulation No. 3 should be applied to Evergreen in its form before the April 1, 1946 amendment, which would require a deduction from the subsidy merely of the amount by which the total cost of live cattle for the accounting periods exceeded the maximum permissible cost, leaving Evergreen a valid subsidy claim in the reduced amount of $139,942.44 for the three months' period. (3) The protest challenged as arbitrary and capricious RFC's adverse determination of Evergreen's application for discretionary relief on the ground of "extenuating circumstances".
 
 
 15
 It is clear that complainant cannot challenge in this proceeding the validity of any provision of MPR 574. That regulation was issued by the Price Administrator under the authority of § 2(a) of the Emergency Price Control Act. It was not a regulation of RFC or by its predecessor, Defense Supplies Corporation. Cf. Illinois Packing Co. v. Bowles, Em.App., 1945, 147 F.2d 554, 558. Functions of the Price Administrator with respect to price regulations, including the processing of protests under § 203(a) of the Price Control Act, were by Executive Order transferred first to the Office of Temporary Controls and ultimately to the Secretary of Commerce; and the statutory time for filing such protests with the Secretary of Commerce, or his delegate the Director of the Division of Liquidation, had long since expired prior to the date on which Evergreen filed its protest in the present proceeding. This is explained in more detail in Charles R. Krimm Lumber Co. v. Turney, Em.App., 1948, 168 F.2d 72, 75.
 
 
 16
 With respect to the challenge to the validity of the sliding scale deductions prescribed in Amendment No. 15 to Revised Regulation No. 3, RFC points out that these provisions were incorporated into the subsidy regulation in compliance with the directive of the Office of Economic Stabilization. The head of this agency was empowered by Executive Order 9250, 7 F.R. 7871 "to issue directives on policy" to the various federal agencies concerned with prices, rents, wages, salaries, profits, rationing, subsidies, and all related matters. Therefore, RFC argues that it is not the proper agency to consider, in effect, the validity of a directive of the Office of Economic Stabilization under the protest procedure of § 203(a) of the Emergency Price Control Act, or to defend the validity of such a directive in review by this court under § 204(a) of the same Act
 
 
 17
 It is true that this court has no jurisdiction to review directly the validity of a directive of the Office of Economic Stabilization. Our jurisdiction under the Emergency Price Control Act is limited to the review of the validity of "any regulation or order under section 2" of that Act. Directives of the Office of Economic Stabilization are not regulations or orders under § 2 of the Price Control Act, but rather derive their authority from the Stabilization Act of 1942, 56 Stat. 765, 50 U.S.C. A.Appendix, § 961 et seq., and delegation by the President in Executive Order 9250 thereunder. However, as we pointed out in Earl C. Gibbs, Inc., v. Defense Supplies Corp., Em.App., 1946, 155 F.2d 525, the underlying authority to formulate and administer price control programs and interrelated subsidy programs remained where it had been placed by §§ 2(a) and 2(e), respectively, of the Emergency Price Control Act; with this qualification, that the Price Administrator, the Federal Loan Administrator, Defense Supplies Corporation and its successor RFC, were obliged to conform to the general line of policy laid down in directives of the Economic Stabilization Director pursuant to the overriding authority conferred upon him by Executive Order 9250. The jurisdiction of this court was not affected by the Stabilization Act of 1942 nor by Executive Order 9250. Thus, in Federated Meat Corp. v. Fleming, Em.App., 1947, 159 F.2d 725, we reviewed a challenge to the validity of M PR 574, though as we have pointed out above this price regulation was issued by the Price Administrator in detailed conformity with Directive 28 of the Office of Economic Stabilization, 10 F.R. 522. MPR 574 was still a regulation under § 2 of the Price Control Act, though its terms were in substance dictated by a directive of the Office of Economic Stabilization; and the Price Administrator, or his successor the Temporary Controls Administrator and later the Director of the Division of Liquidation, Department of Commerce, had the duty of defending the validity of MPR 574 as respondent in this court. Our jurisdiction extends to the review of "any regulation or order under section 2" of the Price Control Act, which includes regulations or orders under § 2(e), as well as price regulations or orders under § 2(a) or rent regulations or orders under § 2(b). As we explained in Illinois Packing Co. v. Bowles, Em.App., 1945, 147 F.2d 554, and Illinois Packing Co. v. Snyder, Em.App., 1945, 151 F.2d 337, the meat subsidy regulation issued first by the Defense Supplies Corporation and later taken over by RFC, was issued under authority of § 2(e) of the Price Control Act, and therefore was a reviewable "regulation or order under section 2". By analogy to our holding in Federated Meat Corp. v. Fleming, supra, we have jurisdiction to review the validity of provisions of the subsidy regulation, despite the fact that such provisions were inserted by the RFC into the subsidy regulation in conformity with a directive of the Office of Economic Stabilization, and RFC is the proper respondent to defend the validity of the subsidy regulation in proceedings before this court.
 
 
 18
 In the foregoing connection, respondent makes the further argument that the function of processing protests challenging the validity of provisions of subsidy regulations was transferred to the Secretary of Commerce by Executive Order 9841 dated April 23, 1947, 12 F.R. 2645; and that by the Supplemental Appropriation Act of 1948, 61 Stat. 619, amending § 203(a) of the Emergency Price Control Act of 1942, protests setting forth objections to any provision of any regulation or order with respect to which responsibility was transferred to the Department of Commerce by Executive Order 9841 were required to be filed within an outside limit of 120 days from July 30, 1947. From this the conclusion is drawn that, in so far as the protest here sought to attack the validity of a provision of the subsidy regulation, as distinguished from its interpretation or application, the protest should have been filed with the Secretary of Commerce, and not RFC, and at a time long since expired.
 
 
 19
 But the premise of this argument is faulty. All that Executive Order 9841 did was to transfer to various agencies functions which had theretofore been vested in the Office of Temporary Controls by Executive Order 9809, 11 F.R. 14281. Executive Order 9809 had consolidated the functions of the Office of Price Administration, of the Office of Economic Stabilization, and of certain other agencies (but not including RFC), into the Office of Temporary Controls. The only functions with reference to subsidies thus transferred to the Office of Temporary Controls were (1) the power which had been delegated to the Office of Economic Stabilization to issue directives of general policy relating to subsidies, and (2) the function vested in the Office of Price Administration pursuant to § 7(b) (5) of Directive 41 of the Office of Economic Stabilization, incorporated by reference into the subsidy regulation, to pass upon petitions by subsidy applicants for relief based upon "extenuating circumstances". These functions of the Office of Temporary Controls with reference to subsidies were by Executive Order 9841 transferred to the RFC when the Office of Temporary Controls was abolished. The Office of Temporary Controls was never charged with the functions of issuing subsidy regulations, or of administering subsidy regulations, including the processing of protests against provisions of subsidy regulations and defending the validity of such regulations in proceedings before this court. That function was in Defense Supplies Corporation and its successor, RFC, and remained in RFC after the creation of the Office of Temporary Controls, and after the latter agency was abolished and its functions redistributed by Executive Order 9841. In Earl C. Gibbs, Inc., v. Defense Supplies Corp., Em.App., 1946, 155 F.2d 525, certiorari denied 1946, 329 U.S. 737, 67 S.Ct. 51, 91 L.Ed. 637, Illinois Packing Co. v. Henderson, Em.App., 1946, 156 F.2d 1000, and Flour Mills of America, Inc., v. R. F. C., Em.App., 1950, 179 F.2d 965, this court considered and determined upon the merits challenges to the validity of provisions of subsidy regulations.
 
 
 20
 For the above reasons, we hold that this court has jurisdiction on the present complaint to pass upon the validity of Amendment 15 to Revised Regulation No. 3, the subsidy regulation. But we cannot declare this provision of the subsidy regulation invalid unless complainant establishes to our satisfaction that it "is not in accordance with law, or is arbitrary or capricious." Section 204(b) of the Emergency Price Control Act. Applying those criteria, we are clear that the challenged provision is valid.
 
 
 21
 As we pointed out in Flour Mills of America, Inc., v. R. F. C., Em.App., 1950, 179 F.2d 965, 969, though we have several times set aside an order or determination of RFC denying a subsidy claim, where we found that the order was "contrary to law," because not in accordance with the proper interpretation of the terms of the regulation, we have on the other hand never had occasion to set aside or declare invalid a provision of the underlying subsidy regulation itself. We further pointed out that, in view of the very wide discretion conferred upon the administrative agencies charged with authority to promulgate a program of government subsidies, the case would necessarily be a rare one in which we would be warranted in setting aside a term of such regulation as being "arbitrary or capricious." We said by way of dictum in Earl C. Gibbs, Inc., v. Defense Supplies Corp., Em.App., 1946, 155 F.2d 525, 531, that if in lieu of a higher level of maximum prices a subsidy were provided for a particular class of sellers, but a provision of the subsidy regulation arbitrarily excluded a member of the class from participation in the subsidy, this court would have jurisdiction to set aside the discriminatory provision as being arbitrary or capricious. And so, a provision in a subsidy regulation found to be in conflict with a directive of the Office of Economic Stabilization might be declared by us to be invalid because "not in accordance with law". But neither of these situations is presented in the case at bar.
 
 
 22
 It is to be borne in mind that complainant cannot in the present proceeding attack the validity of MPR 574, nor may it attack the validity of the subsidy regulation as it existed prior to the issuance of Amendment 15 thereto. It was vital to the success of the cattle stabilization program that slaughterers be subjected to sufficient inducement to keep within the limits of the prescribed maximum permissible costs in their over-all monthly average of purchases of live cattle; otherwise, inflationary pressures would eventually break through the established dollars-and-cents maximum prices for meat on the retail markets. MPR 574 had added the sanctions of the Price Control Act to the sanction of loss of subsidy in order to fortify the policy of keeping slaughterers within these maximum limits in their purchases of live cattle. All that Amendment No. 15 to the subsidy regulation did, with its sliding scale of deductions from subsidy claims, was to fix an outside limit of tolerance for excess cattle costs — two per cent — beyond which an applicant would be wholly deprived of the subsidy for the accounting period in question. It cannot be said that this amounted to an arbitrary "penalty" grossly disproportionate to the amount of the applicant's violations of MPR 574. The purpose of the provision was not "to penalize violators but to prevent the diversion of subsidy funds from the accomplishment of the object for which they were intended". San Antonio Packing Co. v. R. F. C., Em.App., 1950, 182 F.2d 614, 618. See also Federated Meat Corp. v. R. F. C., Em.App., 1950, 183 F.2d 588, 592.
 
 
 23
 Finally, we come to the complaint against RFC's action in denying Evergreen's petition for discretionary relief on the ground of "extenuating circumstances". As we held in Merchants Packing Co. v. R. F. C., Em.App., 1949, 176 F.2d 908, 912, a determination or order by the Price Administrator, or by his successors the Temporary Controls Administrator and ultimately the RFC, denying such an application for discretionary relief, is an order under § 2 of the Price Control Act for purposes of protest and review, since such determination or order is in the course of the administration of the subsidy regulation, which itself was issued pursuant to authority of § 2(e) of the Act. But we can set aside such a determination only if it is so arbitrary or capricious as to amount to an abuse of discretion.
 
 
 24
 We think that this discretionary function, conferred originally upon the Price Administrator, was intended to have reference primarily to circumstances relating to the particular applicant individually, whereby he found himself unwittingly in violation of MPR 574, where the release to such applicant of the withheld subsidies, in whole or in part, would not substantially impair the stabilization program as a whole. We think further that this provision for discretionary relief was intended to be administered within the framework of MPR 574 and the related subsidy regulation, the validity of both of which, for such purpose, was to be assumed. In the present case, if the facts alleged in the protest are accepted as true, the asserted extenuating circumstances are not peculiar to this applicant, but would be equally applicable to the whole group of hundreds of non-processing slaughterers throughout the entire country. It is alleged that under the conditions prevailing in the live cattle markets during April, May and June, 1946, it was practically impossible for anyone other than a large integrated packer to confine his purchases of live cattle, in the over-all monthly average, within the maximum permissible costs established in the cattle stabilization plan. Any wholesale release of withheld subsidies to this large class of non-processing slaughterers, who by hypothesis were bidding up the price of beef cattle beyond the stabilization ranges, would have effectively brought about the collapse of the cattle stabilization plan and would have gone far beyond the exceptional instances of relief, consistent with the general framework of the subsidy regulation, which must have been contemplated when the Price Administrator was vested with the administrative function of acting upon petitions for relief due to extenuating circumstances.
 
 
 25
 Complainant was not organized until April 8, 1946, which was after the issuance of Amendment 15 to the subsidy regulation. It was well aware of the conditions under which the government was offering to pay subsidies for livestock slaughter. Assuming its allegations to be true, and bearing in mind its experience in its first month of operation, Evergreen must have known that in its continued operations it would be in violation of MPR 574. Under its partnership agreement, the costs of its operations, however high they might be, were to be borne by weekly assessments on the 145 retail butchers, who were its limited partners, in proportion to the amount of meat distributed to each for his individual retail business. The meat subsidy was to compensate slaughterers for the squeeze between live cattle prices and the prices of carcass beef and wholesale cuts established by MPR 169, otherwise maximum wholesale and retail prices for meat would have had to be adjusted to a higher level. But Evergreen Meat Company was not for the most part engaged in selling its meat at wholesale through customary distribution channels; it was distributing its slaughtered product in kind to its so-called limited partners without regard to costs of operation, and these costs were made up by weekly assessments on the limited partners. The inflationary pressure on retail prices under such a scheme of organization and distribution is obvious, and we think that RFC could reasonably decline to find that the discretionary release of any part of the withheld subsidies to such a slaughterer "would not be inconsistent with the stabilization program". Such a finding, as well as the finding that the excess of cattle costs was due to extenuating circumstances, is necessary before any release of withheld subsidies is warranted under § 7(b) (5) of Directive 41.
 
 
 26
 A judgment will be entered dismissing the complaint.