196 F.2d 514
 KING PACKING CO.
v.
RECONSTRUCTION FINANCE CORPORATION.
 No. 577.
 United States Emergency Court of Appeals
 Heard at Boise, Idaho, January 4, 1952.
 Decided May 7, 1952.
 
 Robert E. Smylie, Boise, Idaho, with whom Langroise, Clark & Sullivan, Boise, Idaho, were on the brief, for the complainant.
 Maurice S. Meyer, Attorney, Department of Justice, Washington, D. C., with whom J. Gregory Bruce, Attorney, Department of Justice, Washington, D. C., was on the brief, for the respondent.
 Before MARIS, Chief Judge, and MAGRUDER and LINDLEY, Judges.
 MAGRUDER, Judge.
 
 
 1
 The challenge here is to the action of Reconstruction Finance Corporation in partly disallowing complainant's claims for livestock slaughter subsidy payments for the months of February, March, April, May, November and December of 1945, and of January, February, March, April, May, June, September and October of 1946. Upon denial by RFC of a formal protest against such order or determination, complainant filed its complaint in this court under § 204(a) of the Emergency Price Control Act of 1942. 56 Stat. 31, 50 U.S.C.A. Appendix, § 924(a). For a resume of the livestock slaughter subsidy program, and also for the basis of our jurisdiction in this class of cases, see Evergreen Meat Co. v. RFC, E.C.A.1951, 188 F.2d 368.
 
 
 2
 We have many times noted how closely the subsidy program was tied in with the program for controlling meat prices.
 
 
 3
 Revised Regulation 3 (10 F.R. 4241), effective January 19, 1945, issued by respondent's predecessor Defense Supplies Corporation, embodied a so-called cattle stabilization plan which sought to impose indirect controls upon live cattle prices by depriving the buyer of his subsidy to the extent that his total monthly payments for all grades of cattle purchased exceeded the price ranges established for the various grades. These price ranges were fixed with a view to bringing into proper relationship the prices for live cattle and the prices for meat carcasses and wholesale cuts established in Revised Maximum Price Regulation 169 (7 F.R. 10381).
 
 
 4
 The foregoing subsidy regulation drew a distinction between what came to be known as "feeder cattle", that is, cattle which were not purchased and delivered to the subsidy applicant within thirty days of slaughter, and "non-feeder cattle", that is, cattle purchased and delivered to the subsidy applicant within thirty days of slaughter and thus not kept for feeding more than thirty days. Section 7003.7 (c) and (d) required the applicant to file separate subsidy claims for cattle slaughtered in these two distinct categories during each accounting period. At the outset, there was no difference in the subsidy rates applicable to the two categories. But it was only as to non-feeder cattle that the subsidy claims were subject to deduction, as provided in § 7003.8, to the extent that the applicant's actual cost of cattle was below the minimum or above the maximum permissible cost as set forth in the cattle stabilization plan. Accordingly, in filing his subsidy claims for slaughter of non-feeder cattle, the applicant was required to report the cost of all such cattle slaughtered by him during the accounting period. He did not have to report his cattle costs in submitting his separate claims on account of the slaughter of feeder cattle, that is, cattle slaughtered by him during the accounting period which were not purchased and delivered to him within thirty days of slaughter. By amendment 2 to Revised Regulation 3, effective April 1, 1945, an extra basic subsidy was provided for slaughter of non-feeder cattle over and above the compensation for slaughter of feeder cattle; and during the remainder of the accounting periods here in question, though the rates varied from time to time, this differential was maintained.
 
 
 5
 Closely correlated with the subsidy regulation was Maximum Price Regulation 574 issued by the Price Administrator, effective January 29, 1945 (10 F.R. 1270, 1404), § 2 of which provided that no person in the course of trade or business "shall pay for live cattle bought or received during any accounting period an amount higher than the maximum amount fixed by this regulation for such live cattle during such accounting period". The cattle stabilization plan as embodied in Revised Regulation 3 was incorporated into MPR 574, thus adding the sanctions of the Emergency Price Control Act to the sanction of loss or diminution of subsidy, in order to induce slaughterers to keep their purchases of live cattle within the prescribed range prices in the over-all monthly average. Section 9(c) of MPR 574 provided that the calculations for determining the maximum permissible cost of cattle during an accounting period "are the same as the calculations required in an application to Defense Supplies Corporation for subsidy payment on Form No. DS-T-55 Revised pursuant to Livestock Slaughter Payments Regulation No. 3, Revised, of Defense Supplies Corporation." Section 10 of MPR 574 dealt with reports to the Office of Price Administration required of all slaughterers subject to the provisions of MPR 574. Such slaughterers were required to furnish the OPA (1) a copy of Form No. DS-T-55 Revised, on which the slaughterer had filed a claim with Defense Supplies Corporation for cattle slaughter payments on account of non-feeder cattle, which document had to contain the information required to determine the slaughterer's maximum permissible cost and to show the slaughterer's total cost of such cattle for the accounting period, and (2) a copy of Form No. DS-T-55 Revised, submitted to DSC in applying for the subsidy on account of the slaughter, if any, of feeder cattle, that is, "all cattle owned for more than 30 days before slaughter". In addition, MPR 574 established an overriding ceiling price, without regard to grade, for sale or delivery of any live bovine animal or lot of live bovine animals, a regulation applicable both to sellers and buyers.
 
 
 6
 Now for an understanding of the problem in this case, it is necessary to distinguish between three related businesses, G. K. Livestock Company, a partnership, King Packing Company, a partnership, and King Packing Company, a corporation, the complainant in the case at bar.
 
 
 7
 For many years G. K. Livestock Company had been engaged in a general farming and livestock business at Nampa, Idaho. It was a partnership in which George King held a 45 per cent interest, his wife Edith King 45 per cent, and his daughter Mildred King Kelsey 10 per cent. This partnership was set up some time in the middle thirties, with a separate set of books and bank account, as a business unit distinct from King Packing Company, a partnership engaged in the cattle slaughtering business in the same town.
 
 
 8
 The partners in King Packing Company were George King and his wife, each with a 30 per cent interest, their daughter Mildred King Kelsey with 10 per cent, and Allan, Dennis and Catherine Kelsey each with 10 per cent.
 
 
 9
 King Packing Company, complainant herein, is an Idaho corporation, successor to the partnership of the same name, having on January 1, 1946, acquired the business of the partnership and all of its assets and liabilities. The stock of the corporation is held by George King and his wife, each with a 35 per cent interest, their daughter Mildred King Kelsey with a 5 per cent interest, Allan, Dennis and Catherine Kelsey each with 5 per cent, and the remaining 10 per cent owned by four other individuals.
 
 
 10
 In the course of business the G. K. Livestock Company bought cattle and fed them, and sold them to cattle buyers throughout Idaho, including King Packing Company, but with the unsettled market conditions during the war period G. K. Livestock Company came to conduct the feeding operation mainly for the purpose of assuring King Packing Company an adequate supply of high quality beef.
 
 
 11
 There is no suggestion that the two partnerships, G. K. Livestock Company and King Packing Company, were not what they purported to be, two distinct businesses having their respective assets and liabilities, though having certain partners in common. Cf. In re Buckhause, D.C.Mass.1874, 2 Low. 331; In re Haines & Co.'s Estate, 1896, 176 Pa. 354, 35 A. 237; Beacannon v. Liebe, 1884, 11 Or. 443, 5 P. 273; Burrows v. Leech, 1898, 116 Mich. 32, 74 N.W. 296; Pattee v. Paige, 1895, 163 Mass. 352, 40 N. E. 108, 28 L.R.A. 451. And of course, since they were formed long before the war period, it could not be said that they were set up for some evasive or other improper purpose connected with the interrelated price control and subsidy programs under the Emergency Price Control Act. The accounting periods now in question cover months in the years 1945 and 1946; during the former year the slaughtering plant was conducted by the partnership King Packing Company, and during the latter year the plant was conducted by the successor corporation of the same name. In respect to the subsidy claims now before us, it would not seem sensible to draw a distinction between King Packing Company the partnership and the successor corporation.
 
 
 12
 King Packing Company, first the partnership and later the corporation, purchased some of its cattle from G. K. Livestock Company and some from other sources. In submitting its subsidy claims to Defense Supplies Corporation on Form No. DS-T-55 Revised, King Packing Company reported all of the cattle slaughtered as non-feeder cattle, since all the cattle were slaughtered within the 30-day period after their acquisition by it. No distinction was made between cattle bought from G. K. Livestock Company and cattle bought from other sources, though in large part cattle which had been procured from G. K. Livestock Company had been bought by G. K. Livestock Company more than thirty days before their slaughter by King Packing Company.
 
 
 13
 On or about May 15, 1946, respondent RFC, which had meanwhile taken over the functions of its wholly owned subsidiary Defense Supplies Corporation in the administration of the subsidy program, stopped payment on the claims of King Packing Company then in process of being audited for payment, and notified complainant that payments would not be made until King Packing Company refiled its claims so as to report as feeder cattle all cattle acquired by it from G. K. Livestock Company which the latter company had bought more than thirty days before the cattle were slaughtered by King Packing Company. Complainant complied with this demand under protest; and upon recomputation of the claims submitted on the altered basis, respondent concluded that the subsidy payments to complainant for the accounting periods in question should be reduced in the aggregate amount of $18,026.48. A separate issue with reference to the claim for the month of September, 1946, will be discussed later in this opinion.
 
 
 14
 It is conceded that King Packing Company, in all its purchases of cattle, from all sources, kept within the range of minimum and maximum permissible costs as prescribed in the cattle stabilization plan. And it is not suggested that King Packing Company, or for that matter G. K. Livestock Company, ever bought individual cattle or lots of cattle at prices in excess of the overriding ceiling price established by § 8 of MPR 574. In fact, the transcript contains a letter from the Office of Temporary Controls to counsel for complainant dated April 15, 1947, stating that King Packing Company "was in compliance with MPR 574 in all the months involved, and there is no indication that the values placed on the cattle purchased from G. K. Livestock Company were manipulated for the purpose of keeping the Company in compliance with MPR 574."
 
 
 15
 It is respondent's theory that in complying with the reporting provisions of the subsidy regulation in respect of feeder and non-feeder cattle, all cattle which had been purchased by G. K. Livestock Company and subsequently resold to complainant should be treated as having been acquired by the complainant on the earlier date because of the common interests that lay behind the two companies.
 
 
 16
 In respect to the extra compensation, over and above the basic subsidy, payable to non-processing slaughterers, the regulation did contain specific affiliation provisions. A "Non-processing slaughterer," entitled to the extra subsidy, must have been "an unaffiliated slaughterer", that is, a slaughterer who did not "own or control a processor or purveyor of meat," and who was not "owned or controlled by a processor or purveyor of meat." The phrase "Own or control" was also defined specifically in the regulation. See Earl C. Gibbs, Inc. v. Defense Supplies Corp., E.C.A.1946, 155 F.2d 525, 528, certiorari denied, 1946, 329 U.S. 737, 67 S.Ct. 51, 91 L.Ed. 637. Those affiliation provisions could have no application to the present case. Complainant points out that the subsidy regulation contained no comparable affiliation provisions affecting applications for the basic subsidy. Section 7003.7(b) and (c) merely provided that "Every applicant" — in this case King Packing Company — in submitting his subsidy claim for a given accounting period, must report the cost of all cattle slaughtered during the accounting period in the establishment, not including "any cattle slaughtered which were not purchased and delivered to the applicant within thirty (30) days of slaughter." Section 7003.1(o) defined "Applicant" as "any person who files a claim for payment in accordance with this regulation"; and "Person" was defined in § 7003.1(a) as meaning "an individual, corporation, partnership, association, institution, or other business entity, or legal successor or representative of any of the foregoing." Section 7003.7(d) provided that "Any applicant" might file separate claims for cattle slaughtered during the accounting period which were not purchased and delivered to the applicant within thirty days of slaughter. Complainant insists that within the language of the regulation all of its cattle slaughtered were non-feeder cattle, and that it truly reported the cost of such cattle as required by the regulation. It concedes that it might have been reasonable to insert in the subsidy regulation a provision having the effect of requiring the complainant to report as feeder cattle all cattle purchased by it from G. K. Livestock Company which that affiliated company had acquired more than thirty days from the date of slaughter. But in the absence of such an affiliation provision, the contention is that RFC is bound by the subsidy regulation as written, and must pay subsidies, in accordance with its terms, to applicants who slaughtered cattle in reliance upon it. In several cases we have so held. Maloney Packing Co. v. RFC, Em.App.1947, 159 F.2d 717; Belle City Packing Co. v. RFC, Em.App.1948, 169 F.2d 413; Earl C. Gibbs, Inc. v. RFC, Em. App.1948, 169 F.2d 654. We think these cases support the position of complainant in the case at bar.
 
 
 17
 Respondent's main reliance is upon Amendment 2 to MPR 574 (10 F.R. 4099). In the first place this amendment did not become effective until April 17, 1945, which was subsequent to some of the accounting periods now in question. In the second place, it is an amendment of the price regulation, not of the subsidy regulation, and so far as we can see has no bearing on the present problem.
 
 
 18
 This Amendment 2 to MPR 574 added a § 1(b) (4) providing, in part, that MPR 574 shall not apply to "sales or deliveries of live bovine animals to a person, not engaged in the slaughter of live bovine animals except as a farm slaughterer, for feeding for more than 30 days. * * * A person shall be deemed to be engaged in the slaughter of live bovine animals if he is financially affiliated with a person who is engaged in the slaughter of live bovine animals." The statement of considerations accompanying the issuance of the amendment recited that its purpose was "to exempt from the pricing provisions of the regulation sales of live bovine animals to non-slaughterers for feeding for more than 30 days. Because these animals consist of the lower grades when sold, there is little likelihood of sales being made above the overriding ceiling prices. Such animals are sometimes sold on a per head basis rather than on a weight basis. In order to prevent such sales from being used to evade the overriding ceiling prices fixed in the regulation, the exemption does not apply to sales of animals for feeding purposes to persons who engage in slaughtering operations except as a farm slaughterer. To permit sales to slaughterers for feeding purposes without regard to the overriding ceiling prices might well open the door to evasive sales to slaughterers for slaughter purposes." In other words, the affiliation provision in § 1(b) (4) of MPR 574 would merely have required that G. K. Livestock Company, though itself not engaged in slaughtering, must be treated as a slaughterer, for purposes of the amendment, because of its affiliation with a slaughterer, namely, King Livestock Company; so that when G. K. Livestock Company made purchases of cattle it was not exempted from the overriding ceiling price established by MPR 574. The amendment has no bearing on the eligibility of King Packing Company for the basic subsidy in accordance with the provisions of the subsidy regulation.
 
 
 19
 Respondent also puts some reliance upon a provision of Amendment 3 to its Revised Regulation 3 (10 F.R. 8073, 10 F.R. 11153). The amendment added a subsection (c) to § 7003.10 of the subsidy regulation, providing that subsidy claims shall be invalid "which the Price Administrator finds are not an accurate reflection of the applicant's operations and the amounts of payments properly due. Defense Supplies Corporation shall declare invalid, in whole or in part, any claim filed by an applicant who, in the judgment of the Price Administrator * * * (3) Has used any direct or indirect method, transaction, practice, or device in filing claims which results in a claim for subsidy payments to which he is not wholly entitled under this part". This amendment did not become effective until May 1, 1945, subsequent to three of the accounting periods in question. Furthermore, we do not see how the amendment lends any support to respondent's position. If under the other terms of the subsidy regulation King Packing Company was not required to treat purchases by G. K. Livestock Company as its own, then the claims as originally submitted by complainant did accurately reflect "the applicant's operations and the amounts of payments properly due." If complainant's reports of cattle costs, pursuant to the cattle stabilization plan, as submitted to Defense Supplies Corporation in support of its claims for the basic subsidy payments, were in compliance with the requirements of the subsidy regulation, then the copies of such reports, required to be filed with the Office of Price Administration under MPR 574, were also necessarily a full compliance with the reporting requirements of the price regulation.
 
 
 20
 It is our conclusion, on this branch of the case, that complainant has made out a case for relief.
 
 
 21
 As to the claim for September, 1946, the Office of Temporary Controls, as successor to the Office of Price Administration, certified to respondent that complainant had slaughtered cattle in excess of its authorized quota for that accounting period. Upon receipt of this certification, RFC invalidated the claim for September, 1946, in accordance with § 7003.10(a) (4) of Revised Regulation 3, as amended by Amendment 17, effective April 26, 1946. Directive 41 of the Office of Economic Stabilization, as amended by Amendment 4 thereto (11 F.R. 4340), provided in § 7(e) (4) that if a slaughterer had exceeded his authorized quota by an amount not in excess of 3 per cent, he might apply to the Price Administrator for a release of the withheld subsidy; and that upon certification by the Price Administrator that the excess slaughter "was due to extenuating circumstances and that the release of the subsidy withheld would not be inconsistent with the stabilization program," RFC should then make payment forthwith. But complainant made no application for relief under this provision.
 
 
 22
 Complainant insists that it did not exceed its slaughter quota for September, 1946. It was a Class 1 slaughterer, as defined in War Food Order 75 (8 F.R. 11119), that is, a slaughterer "whose establishment is operated under federal inspection." Originally the quotas for Class 1 slaughterers were fixed by the Department of Agriculture. Later, authority to establish and enforce quotas for Class 1 slaughterers was delegated to the Office of Price Administration by Amendment 3 to War Food Order 123 (11 F.R. 9612). By telegram September 18, 1946, OPA notified complainant that for September and October, 1946, it might use the adjusted quota basis for July, 1946, theretofore granted by the Department of Agriculture under War Food Order 75-7 — which adjusted quota was 826,000 pounds live weight. And see Amendments 3 and 4 to Control Order 2 issued by the Office of Price Administration (11 F.R. 9689, 11011). Complainant's slaughter was restricted to 90 per cent of this adjusted quota base of 826,000, or 743,400 pounds. See Control Order 2, Amendment 5 to Supplement 1 (11 F.R. 10003). Complainant's actual slaughter for September, 1946, was 753,205 pounds of cattle, which was then roughly 10,000 pounds over the maximum. However, complainant asserts that it was entitled to an additional quota allowance of 35,105 pounds for July, 1946, being 5 per cent of the amount of its unused quota for the preceding quota period; that this carry-over privilege was accorded by War Food Order 75-1 (8 F.R. 11327). But just prior to the transfer of quota control over Class 1 slaughterers to the Office of Price Administration, complainant was subject to War Food Order 75-7 (11 F.R. 4644), which contained no such carry-over privilege. Hence when the OPA, in September, 1946, permitted complainant to use for September, 1946, the adjusted quota basis theretofore granted by the Department of Agriculture for July, 1946, under War Food Order 75-7, complainant acquired no carry-over privilege with respect to any portion of its unused quota for June, 1946. When Control Order 2 was amended, effective September 1, 1946 (11 F.R. 9689), to include Class 1 slaughterers, giving them the same carry-over provisions which § 9 of Control Order 2 (11 F.R. 4661) had previously accorded to Class 2 slaughterers, this amendment was only prospective in operation.
 
 
 23
 We conclude that complainant has shown no basis for relief in respect of the disallowance of its subsidy application for the month of September, 1946.
 
 
 24
 A judgment will be entered setting aside the letter order of Reconstruction Finance Corporation dated July 17, 1951, denying complainant's protest, and remanding the case to Reconstruction Finance Corporation for further proceedings not inconsistent with this opinion.