201 F.2d 515
 ZITRON BROS., Inc.
v.
RECONSTRUCTION FINANCE CORP.
 No. 568.
 United States Emergency Court of Appeals.
 Heard at New York, N. Y., December 8, 1952.
 Decided February 3, 1953.
 
 Alexander Boskoff, Washington, D. C., for complainant.
 George Arthur Fruit, Washington, D. C., Attorney, with whom Holmes Baldridge, Asst. Atty. Gen., and Marvin C. Taylor, both of Washington, D. C., all of Department of Justice, were on the brief, for respondent.
 Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.
 MAGRUDER, Judge.
 
 
 1
 Zitron Bros., Inc., filed with respondent Reconstruction Finance Corporation its claim for livestock slaughter subsidy payments for the accounting period May, 1946, alleged to be due under Revised Regulation 3, as amended. In processing the claim, respondent determined to withhold from the applicant 60 per cent of the claimed subsidy payment, under § 7003.6(b) (3) of the amended subsidy regulation, prescribing a sliding scale of automatic deductions based upon the extent to which applicant's costs of cattle exceeded its "maximum permissible cost" under the so-called cattle stabilization plan. Zitron Brothers had reported cattle costs which were 1.6 per cent in excess of its maximum permissible cost. The prescribed deduction was 60 per cent where the cost of cattle exceeded the maximum permissible cost by 1 to 2 per cent.
 
 
 2
 For further details of this subsidy program, see the full explanations in Evergreen Meat Co. v. R. F. C., Em.App., 1951, 188 F.2d 368; Merchants Packing Co. v. R. C. F., Em.App., 1949, 176 F.2d 908. Also see our earlier cases cited in those two opinions.
 
 
 3
 Complainant filed with RFC its formal protest against the above determination or order. Upon denial of the protest complaint was filed in this court.
 
 
 4
 The protest sought to challenge the validity of two provisions of the subsidy regulation pursuant to which the determination had been made. Further, the protest claimed that Zitron's exceeding of its maximum permissible cost during May, 1946, was due to "extenuating circumstances" and that RFC was arbitrary or capricious in refusing to release the withheld subsidy under the dispensing power which had been delegated to it.
 
 
 5
 As to the attacks on the subsidy regulation itself, we have repeatedly explained why it would be a rare case indeed in which we would be justified in setting aside a provision of the underlying regulation under which this livestock slaughter subsidy was payable. Flour Mills of America, Inc. v. R. F. C., Em.App., 1950, 179 F.2d 965, 969; Evergreen Meat Co. v. R. F. C., Em. App., 1951, 188 F.2d 368, 375; Danz v. R. F. C., Em.App., 1952, 193 F.2d 1010, 1017; West Coast Meat Co. v. R. F. C., Em.App., 1952, 197 F.2d 866, 868-69. See also Earl C. Gibbs, Inc., v. Defense Supplies Corp., Em.App., 1946, 155 F.2d 525, 530. This is not such a rare and exceptional case.
 
 
 6
 Specifically, complainant attacks the validity of § 7003.8(c)(3) of the amended subsidy regulation, modifying the earlier formula by which the maximum permissible cost of live cattle was to be ascertained under the cattle stabilization plan. The original formula was explained by us in Federated Meat Corp. v. Fleming, Em.App., 1947, 159 F.2d 725, 726, as follows:
 
 
 7
 "The total maximum permissible payment (without loss of subsidy) for all cattle slaughtered during a monthly accounting period was computed in the following manner: After slaughter, the dressed carcasses were graded. The slaughterer determined the total tonnage of beef carcasses, by grades, obtained from the cattle slaughtered during the monthly accounting period. The equivalent or `calculated' live weight of cattle in each grade slaughtered during the period was computed from the dressed carcass weights by the use of conversion factors or average dressing percentages, each dressing percentage being the ratio of the weight of the dressed carcass of the particular grade to the calculated live weight of the animal. These conversion factors, which were determined and certified to the Defense Supplies Corporation by joint order of the Price Administrator and the War Food Administrator, were as follows for the different grades: Choice, 61%; good, 58%; commercial or medium, 56%; utility or common, 54%; canner and cutter, 46%; and bulls of canner and cutter grade, 53%. That meant, for example, that a steer of `choice' grade was assumed to yield a dressed carcass weight of 61% of the live weight; and so on, through the various lower grades. The calculated live weight did not necessarily coincide with the actual weight of the steer before slaughter, but was arrived at by working backward from the graded dressed carcass, the weight of which was divided by the standard percentage yield factor applicable to the particular grade. The aggregate calculated live weight for cattle of each grade slaughtered during the accounting period was multiplied by the maximum price of the applicable range prices, and the amounts thus derived for each grade were added together. The resulting total figure was the maximum permissible amount which the slaughterer could pay for the cattle slaughtered during the accounting period without loss of subsidy."
 
 
 8
 By Amendment 14 to Revised Regulation No. 3, issued February 6, 1946, RFC inserted a new § 7003.8(c)(3), reading as follows:
 
 
 9
 "(3) If the total calculated live-weight exceeds the total actual live-weight (less condemnations) the amount of actual liveweight allocated to each grade (see Section 7003.6(a) (2)) shall be used instead of the calculated liveweight in computing the minimum and maximum permissible costs, except by special permission of RFC."
 
 
 10
 This amendment was made pursuant to a directive of the Office of Economic Stabilization so as to conform the cattle stabilization plan, as embodied in the subsidy regulation, to a corresponding amendment which had been made by the Price Administrator to the cattle stabilization plan as embodied also in Maximum Price Regulation 574 (11 F.R. 1349). As we have previously pointed out: "The provisions of the subsidy regulation and of MPR 574 were interwoven as parts of a single stabilization program." Danz v. R. F. C., Em. App., 1952, 193 F.2d 1010, 1016. See further, our discussion in Evergreen Meat Co. v. R. F. C., Em.App., 1951, 188 F.2d 368, 370-71.
 
 
 11
 In his Statement of Considerations accompanying the issuance of Amendment No. 4 to MPR 574, the Price Administrator explained the reasons for making the above change in the formula for computing the maximum permissible cost under the cattle stabilization plan, as follows — Pike & Fischer OPA Price Service, Food Desk Book 4, p. 47,547-48:
 
 
 12
 "Section 9 stipulates maximum amounts which certain slaughterers may pay for all cattle slaughtered during an accounting period. * * * Paragraph (b) of Section 9, in explaining how the maximum permissible cost of cattle is determined, provides in subparagraph (b)(3) that the maximum price of the established prices for each grade applicable to the establishment shall be multiplied by the `calculated live weight' of such grade. This is revised to provide that, if the `calculated live weight' of the cattle slaughtered exceeds the actual `net live weight,' the maximum price of the established prices for each grade shall be multiplied by the `actual' live weight of such grade rather than by the calculated live weight of such grade to determine the maximum permissible payment.
 
 
 13
 "Experience under the regulation has demonstrated that with cattle prices pressing the maximums at many points, the DS-T-55 forms filed by slaughterers frequently show calculated live weights higher than the net live weights. This result will follow in any case in which the actual yields of chilled carcass weights of beef exceed the conversion factors for the various grades established in the regulation. In some instances, the actual yield will exceed the conversion factors, especially in the case of the top grades and heavier weights of steers and all grades of bulls. However, the instances in which these higher yields will be obtained over a month's time are not numerous and the extent of the overage is relatively small.
 
 
 14
 "The number of instances in which the reported calculated live weight exceeds the actual weight has increased considerably since MPR 574 became effective and is occurring more frequently in reports of slaughterers with respect to the lower grades of beef, where actual yields are likely to be low relative to the stated conversion factors. In other words, investigation has revealed that the amount of excess shown on the forms indicates a dressing yield considerably above the normal range of experience for the grades slaughtered. As a result of this survey, the Administrator is forced to conclude that chilled carcass weights are being padded as a means of increasing the slaughterer's maximum permissible cost in order to remain in apparent compliance with MPR 574 and to avoid loss of subsidy. Because of this trend, it is deemed advisable to prohibit the determination of maximum permissible costs by the use of calculated live weights when the calculated live weight exceeds the actual live weight. This will place an upper limit on the extent of falsification and should reduce the amount of subsidy paid out to slaughterers who are not entitled to receive it."
 
 
 15
 There is nothing in the present record to give a basis for questioning the accuracy of the foregoing recital by the Price Administrator. In objection to the amendment requiring that the actual live weight rather than the calculated live weight should be used in computing the maximum permissible cost wherever the calculated live weight exceeded the actual live weight, complainant states that § 7003.8(c)(3) of the subsidy regulation, as revised, "is based upon the arbitrary, irrebuttable presumption that all slaughterers have acted fraudulently who report a total calculated live weight in excess of actual live weight"; and that the regulation is invalid "because it does not permit a slaughterer an opportunity to show that no fraud existed in his operations and that the higher calculated live weight came about as a normal incident of his business." We think it is clear that this objection is not well taken. The amendment in question did not establish an irrebuttable presumption of fraud. Indeed, the Price Administrator recognized that in relatively infrequent instances a slaughterer's figures for calculated live weight might exceed the actual live weight quite honestly, and without fraud or manipulation. The amendment was undoubtedly designed to prevent fraud, which the Price Administrator had reason to believe was becoming more and more widespread under the earlier formula; and for administrative convenience it foreclosed this possibility of fraud by laying down a rule of thumb requiring computation of maximum permissible cost on the basis of actual live weight whenever the "calculated" live weight was higher. We are unable to conclude that this amendment of the subsidy regulation was arbitrary or capricious, or contrary to law.
 
 
 16
 Complainant also challenges the validity of § 7003.6(b)(3) providing the sliding scale of deductions from subsidy payments where an applicant's costs of cattle during a given accounting period exceeded its maximum permissible cost under the cattle stabilization plan. We have already upheld the validity of this provision in the subsidy regulation, in Evergreen Meat Co. v. R. F. C., Em.App., 1951, 188 F.2d 368, 375-76, and we adhere to that ruling.
 
 
 17
 Finally, we come to complainant's argument that RFC was arbitrary and capricious in its refusal to find that Zitron's failure to keep within the maximum permissible cost for its purchases of cattle in May, 1946, was due to "extenuating circumstances", and in its consequent refusal to release any part of the withheld subsidy payments under the discretionary power conferred upon it. This dispensing power was first lodged in the Price Administrator, but by successive Executive Orders it was later transferred to the Office of Temporary Controls and eventually to RFC itself. See Merchants Packing Co. v. R. F. C., Em.App., 1949, 176 F.2d 908, 910-12. It appears that Zitron originally made an application to the Office of Temporary Controls for relief on account of extenuating circumstances, and that this application was denied. In its order denying the protest, RFC "determined that no evidence has been furnished this Agency which would justify our reversing the Office of Temporary Controls' decision that the slaughterer's excess cattle costs for the month of May 1946 were not due to extenuating circumstances * * *".
 
 
 18
 In its protest, complainant based its claim of extenuating circumstances upon the fact that shipments of cattle from point of purchase in Chicago to complainant's slaughtering plant in Milwaukee were delayed during the month of May, 1946, because of labor difficulties on the railroads. The protest stated:
 
 
 19
 "These difficulties started with delays in shipments in the Milwaukee area as early as the first week of May 1946 and culminated in the nationwide strike on May 23, 1946. During this period of delays and actual strike more than 400 head of cattle, purchased by protestant and shipped to its plant, were involved. Protestant was buying high grade cattle at the time, which should have been graded out AA or A. Many of the cattle which were delayed in transit, however, lost some of their `bloom' during the delay, and were accordingly down graded by the official grader. This resulted in raising protestant's calculated live weight so that it exceeded actual live weight. Since your regulations forbade the use of the higher calculated live weight in computing permissible cost, protestant found itself, through circumstances over which it had no control, out of compliance for the month of May 1946 and was deprived of a great part of its subsidy for that accounting period."
 
 
 20
 In its brief, complainant explains how this loss of "bloom" due to delay in shipment might have the effect claimed in the protest. The general point is understandable, though the mathematics is a bit off:
 
 
 21
 "For instance, if Zitron purchased an average grade AA steer of 1,000 lbs., its average yield would be 61%, or 610 lbs. If the steer had lost its `bloom' and were downgraded to A, it would still produce approximately 610 lbs. of dressed beef. However, as the grade B average yield was set at 56%, the calculated liveweight of the steer would be approximately 1,052 lbs., as against the actual liveweight of 1,000 lbs. If Zitron had paid the AA drove ceiling for the steer, $16.90 per cwt., an AA grading would give him a maximum permissible cost of $169, which would be equal to actual cost. An A grading and the use of actual liveweight would give him a permissible cost of $156.50, as against $164.63 using calculated liveweight."
 
 
 22
 Zitron admitted that "it was impossible to verify its claims by specific evidence". The only evidence which complainant submitted in support of its theory, aside from its good compliance record for the preceding four months of 1946, was (1) an affidavit by the secretary of the Milwaukee Dressed Beef Company that cattle, purchased in Chicago, "when shipped to us, normally arrive in the morning of the following day"; and (2) an affidavit by an employee of Zitron Brothers, whose job it was to unload, feed, and water cattle. The latter stated: "Ordinarily cattle brought in from Chicago are delivered to our pens in the morning of the following day. During the week of May 9th through May 15th, 1946 we received 326 cattle from Chicago. The service during that week was so poor that our cattle arrived at our pens at 9 o'clock P.M. to 11 o'clock P.M., long after everyone had left the plant for the day. Consequently cattle, instead of being 12 to 16 hours enroute, were kept 36 to 40 hours before being unloaded, watered and feed [sic]."
 
 
 23
 The period referred to in this second affidavit was prior to the railroad strike, which began May 23, 1946. It may be, however, that some delays occurred in the earlier period in anticipation of the threatened strike. The "326 cattle" referred to in the affidavit were part of a total of 1640 head of cattle purchased and shipped during May, 1946. Whether the dressed carcasses from these 326 head of cattle were actually down-graded by the official grader does not appear. Whether they had lost some of their "bloom", without loss of weight, due to the overnight delay in unloading, watering and feeding them, does not appear. It was all pure speculation. Also, if the slaughterer really had reason to anticipate that such overnight delay might result in any appreciable or extensive "loss of bloom", would it not, in the exercise of ordinary care, have arranged to have an employee available to unload, water and feed a shipment of cattle which might arrive after the plant had closed for the day? The record in fact contains absolutely no expert evidence to support this "loss of bloom" hypothesis, other than an office memorandum from the files of RFC purporting to have been prepared by one Louis L. Finegan and summarizing a conference between officials of RFC and counsel for the complainant while the protest proceedings were pending. The office memorandum stated complainant's theory "that the additional 12 hours' delay caused the cattle to arrive after closing time and that carry over to the next day took the bloom off the cattle so that they lost grade." Further the memorandum recited that the RFC officials present "checked this interesting theory with Mr. M. O. Cooper of the Department of Agriculture, who is an expert in this field. He expressed the opinion that this might actually happen in respect of a few borderline animals, but that it is unlikely to have had substantial material effect on the grading of whole droves." Complainant made a motion to strike this office memorandum from the transcript. We entered an order denying the motion, without prejudice to complainant's right to object to its relevancy and materiality. Though we did not order the memorandum stricken, we have, in deciding the case, paid no attention to the purported opinion of Mr. Cooper introduced in this hearsay manner. But disregarding that, and with a record bare of any scientific evidence, it does not seem to us that RFC was bound to take judicial notice of the asserted fact, which might or might not be susceptible of scientific proof, namely, that complainant's noncompliance in May, 1946, was probably due to a "loss of bloom" which these 326 head of cattle must have suffered by reason of the twelve-hour delay. We gave leave to complainant to introduce as additional evidence the testimony of Mr. Cooper but complainant saw fit not to do so.
 
 
 24
 Complainant asserts that discretionary relief was afforded to two other slaughterers under somewhat similar circumstances. However, complainant has failed to satisfy us that the two cases referred to were sufficiently similar to the one at bar so that we might conclude that RFC, in administering this provision for discretionary relief, failed to apply to Zitron a self-imposed administrative standard which it applied to other applicants for relief.
 
 
 25
 Upon the whole record we cannot say that RFC was arbitrary or capricious in its determination that Zitron had failed to make a sufficient showing to justify reversal of the earlier decision of the Office of Temporary Controls denying the application for discretionary relief.
 
 
 26
 A judgment will be entered dismissing the complaint.